Case No. 21-10296

# United States Court of Appeals
## for the Ninth Circuit

| United States of America, | D.C. No. 3:19-cr-00026-LRH-WGC |
|---|---|
| Plaintiff/Appellee, | |
| v. | |
| Myron Motley, | |
| Defendant/Appellant. | |

Appeal from the United States District Court
for the District of Nevada

## Appellant Myron Motley's
## Opening Brief

Rene L. Valladares
Federal Public Defender
*Aarin E. Kevorkian
*Ellesse Henderson
Assistant Federal Public Defenders
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
(702) 388-6577
Aarin_Kevorkian@fd.org
Ellesse_Henderson@fd.org

*Counsel for Appellant Myron Motley

# Table of Contents

Table of Contents.................................................................i

Table of Authorities ..........................................................v

Jurisdictional Statement...................................................1

Detention Status...............................................................1

Issues Presented ..............................................................1

Relevant Statutes and Sentencing Guidelines....................2

Statement of the Case .....................................................2

I.    Officials surveilled Motley's movements over several months, then wiretapped Motley's phone. ...........................................................2

   A.    The state tracking warrant.................................2

   B.    The federal tracking warrant ...........................4

   C.    The federal wiretap warrant ............................4

   D.    The indictment ...............................................5

II.   Motley moved to suppress the evidence obtained from the warrants...............................................................5

III.  Motley proceeded to trial and, after unsuccessfully challenging numerous errors, was convicted. ..............................6

   A.    *Batson* challenge ...........................................6

   B.    Trial testimony ...............................................8

   C.    Challenges at the close of evidence .................10

IV.   The district court imposed a 179-month sentence.........10

Summary of the Argument ..............................................12

Argument .......................................................................13

I. Pretrial errors ..................................................................................... 13

   A. The district court erroneously denied Motley's motion to suppress. .................................................................................. 13

      1. Standard of review ................................................... 13

      2. The initial tracking warrant was based on an unconstitutional warrantless search and an unreliable informant's tip. ........... 14

        a) The warrantless search through Motley's private medical records violated the Fourth Amendment. ............................... 15

          (1) Motley had a reasonable expectation of privacy in his medical records. ............................................... 16

            (a) Motley had a subjective expectation of privacy in his medical records. .............................................. 16

            (b) Motley's subjective expectation of privacy was objectively reasonable. ........................................ 17

          (2) No exception excuses the government's warrantless search. ................................................................. 23

            (a) Third-party doctrine ..................................... 24

            (b) Good faith ................................................. 27

            (c) Closely regulated industry ............................. 29

        b) Law enforcement made unjustified assumptions based on Motley's PMP records. .......................................... 32

        c) No other evidence supports issuance of the tracking warrant. ................................................................. 33

      3. The second tracking warrant was based on the unconstitutional fruits from the improper initial warrant. .... 35

      4. The wiretap order did not comply with federal surveillance law. ................................................................. 35

        a) Probable cause ................................................ 36

        b) Necessity .................................................... 38

B. The district court violated Motley's right to a speedy trial. ........ 42

    1. Standard of review ................................................... 42

    2. Speedy Trial Act ...................................................... 42

    3. Sixth Amendment ..................................................... 44

II. Trial errors .................................................................. 46

A. The government's race-based use of a peremptory strike violated *Batson*. ..................................................................... 46

    1. Standard of review ................................................... 46

    2. Erroneous *Batson* denial ............................................ 46

        a) Wrong legal standard below ................................. 47

        b) Purposeful discrimination .................................. 49

B. Insufficient evidence supported the verdict. ........................... 52

    1. Standard of review ................................................... 52

    2. Knowledge .............................................................. 53

    3. Agreement .............................................................. 55

C. The district court committed numerous errors when instructing the jury. ...................................................................... 59

    1. Standards of review ................................................. 59

    2. Mens rea ................................................................ 61

    3. Specific unanimity .................................................... 62

    4. Multiple conspiracies ............................................... 67

    5. Constructive amendment ............................................. 69

III. Sentencing errors ........................................................... 69

A. Standards of review .................................................... 69

B.    Leadership enhancement ............................................................ 70

C.    *Kimbrough* discretion ............................................................. 72

D.    Drug weight ............................................................................ 73

E.    Substantively unreasonable sentence ...................................... 75

F.    Deviation from oral sentence .................................................. 76

G.    Improper delegation ................................................................ 77

Conclusion .................................................................................................. 78

Certificate of Service

Certificate of Compliance

Statement of Related Cases

Addendum

iv

## Table of Authorities

**Federal Cases**                                                    **Page(s)**

*Anobile v. Pelligrino,*
    303 F.3d 107 (2d Cir. 2002) ............................................................... 32

*Arizona v. Gant,*
    556 U.S. 332 (2009) ...................................................................... 23-24

*Barker v. Wingo,*
    407 U.S. 514 (1972) ............................................................... 44, 45, 46

*Batson v. Kentucky,*
    476 U.S. 79 (1986) ................................................................. 47, 50, 51

*Betterman v. Montana,*
    578 U.S. 437 (2016) ......................................................................... 44

*California v. Greenwood,*
    486 U.S. 35 (1988) ........................................................................... 26

*Carpenter v. United States,*
    138 S. Ct. 2206 (2018) ............................................. 23, 24, 25, 26, 28

*Chandler v. U.S. Army,*
    125 F.3d 1296 (9th Cir. 1997) ......................................................... 36

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000) ........................................................................... 30

*City of Los Angeles, Calif. v. Patel,*
    576 U.S. 409 (2015) ........................................................27, 29, 30, 31

*Conde v. Henry,*
    198 F.3d 734 (9th Cir. 1999) ........................................................... 61

*Crowe v. Cnty. of San Diego,*
    608 F.3d 406 (9th Cir. 2010) ........................................................... 34

*Currie v. McDowell,*
    825 F.3d 603 (9th Cir. 2016) ............................................................ 50

*Davis v. United States,*
    564 U.S. 229 (2011) ........................................................................ 27

*DeMassa v. Nunez,*
    770 F.2d 1505 (9th Cir. 1985) .......................................................... 26

*Doe v. Att'y Gen. of U.S.,*
    941 F.2d 780 (9th Cir. 1991) ............................................................ 19

*Doe v. Se. Pennsylvania Transp. Auth. (SEPTA),*
    72 F.3d 1133 (3d Cir. 1995) ........................................................ 19, 22

*Doggett v. United States,*
    505 U.S. 647 (1992) ................................................................. 44-45, 46

*Douglas v. Dobbs,*
    419 F.3d 1097 (10th Cir. 2005) ............................................. 19, 21, 28

*Ferguson v. City of Charleston,*
    532 U.S. 67 (2001) ................................................... 17, 20, 22, 26, 28

*Fernandez v. Roe,*
    286 F.3d 1073 (9th Cir. 2002) .......................................................... 48

*Flowers v. Mississippi,*
    139 S. Ct. 2228 (2019) .......................................................... 47, 48, 49

*Franks v. Delaware,*
    438 U.S. 154 (1978) ........................................................................ 34

*Furlow v. United States,*
    644 F.2d 764–69 (9th Cir. 1981) ...................................................... 43

*Illinois v. Gates,*
    462 U.S. 213 (1983) ........................................................................ 38

*Illinois v. Krull*,
  480 U.S. 340 (1987) ...................................................................... 27-28

*Jaffee v. Redmond*,
  518 U.S. 1 (1996) ............................................................................. 19

*Kimbrough v. United States*,
  552 U.S. 85 (2007) ........................................................................... 72

*Kotteakos v. United States*,
  328 U.S. 750 (1946) .......................................................................... 67

*Lane v. Pena*,
  518 U.S. 187 (1996) .......................................................................... 19

*Liberty Coins, LLC v. Goodman*,
  880 F.3d 274 (6th Cir. 2018) ...................................................... 30, 31

*McClain v. Prunty*,
  217 F.3d 1209 (9th Cir. 2000) ........................................................... 50

*McFadden v. United States*,
  576 U.S. 186 (2015) ..................................................................... 53, 54

*Michigan v. DeFillippo*,
  443 U.S. 31 (1979) ............................................................................ 28

*Miller-El v. Cockrell*,
  537 U.S. 322 (2003) .......................................................................... 50

*Miller-El v. Dretke*,
  545 U.S. 231 (2005) .......................................................................... 51

*New York v. Burger*,
  482 U.S. 691 (1987) ............................................................. 29, 30, 31

*Norman-Bloodsaw v. Lawrence Berkeley Lab'y*,
  135 F.3d 1260 (9th Cir. 1998) ................................................ 19, 21, 28

vii

*O'Connor v. Ortega,*

480 U.S. 709 (1987) ...................................................................... 17, 18

*Oregon Prescription Drug Monitoring Program (PDMP) v. U.S. Drug Enf't Admin.,*

998 F. Supp. 2d 957 (D. Or. 2014) ............................................. *passim*

*Patel v. City of Los Angeles,*

738 F.3d 1058 (9th Cir. 2013) ............................................................ 27

*Perez Cruz v. Barr,*

926 F.3d 1128 (9th Cir. 2019) ..................................................... 28, 30

*Powell v. Ohio,*

499 U.S. 400 (1991) ........................................................................... 46

*Rogers v. United States,*

340 U.S. 367 (1951) ........................................................................... 38

*Shirley v. Yates,*

807 F.3d 1090 (9th Cir. 2015) ..................................................... 48, 50

*Smith v. City of Salem, Ohio,*

378 F.3d 566 (6th Cir. 2004) ............................................................ 19

*Smith v. Maryland,*

442 U.S. 735 (1979) ........................................................................... 24

*Stirone v. United States,*

361 U.S. 212 (1960) ........................................................................... 69

*Payton v. New York,*

445 U.S. 573 (1980) ........................................................................... 28

*Tucson Woman's Clinic v. Eden,*

379 F.3d 531 (9th Cir. 2004) ................................... 17, 21, 26, 28, 29

*U.S. DOJ v. Utah Dep't of Com.,*

2017 WL 3189868 (D. Utah July 27, 2017) ................................ 23, 31

*United States v. Alanis,*
    335 F.3d 965 (9th Cir. 2003) ........................................... 47, 49, 50, 51

*United States v. Alvarez-Ulloa,*
    784 F.3d 558 (9th Cir. 2015) ...................................................... 46, 49

*United States v. Anguiano,*
    873 F.2d 1314 (9th Cir. 1989) ........................................................ 68

*United States v. Anguiano-Morfin,*
    713 F.3d 1208 (9th Cir. 2013) ........................................................ 59

*United States v. Angulo-Lopez,*
    791 F.2d 1394 (9th Cir. 1986) .................................................... 33, 35

*United States v. Artis,*
    919 F.3d 1123 (9th Cir. 2019) ........................................................ 14

*United States v. Avila,*
    95 F.3d 887 (9th Cir. 1996) ...................................................... 71, 72

*United States v. Bishop,*
    264 F.3d 919 (9th Cir. 2001) ......................................................... 33

*United States v. Bishop,*
    959 F.2d 820 (9th Cir. 1992) ......................................................... 50

*United States v. Biswell,*
    406 U.S. 311 (1972) ................................................................... 31

*United States v. Blackmon,*
    273 F.3d 1204 (9th Cir. 2001) .................................... 35-36, 36, 40, 42

*United States v. Brown,*
    925 F.3d 1150 (9th Cir. 2019) ........................................................ 33

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) ......................................................... 70

*United States v. Chen Chiang Liu,*
631 F.3d 993 (9th Cir. 2011) ............................................................ 68

*United States v. Chinchilla,*
874 F.2d 695 (9th Cir. 1989) ........................................................ 51-52

*United States v. Collazo,*
984 F.3d 1308 (9th Cir. 2021) .................................... 53, 54, 55, 56, 60

*United States v. Cotterman,*
709 F.3d 952 (9th Cir. 2013) ............................................................ 16

*United States v. Delgadillo-Velasquez,*
856 F.2d 1292 (9th Cir. 1988) .......................................................... 34

*United States v. Devita,*
526 F.2d 81 (9th Cir. 1975) .............................................................. 34

*United States v. Esparza-Gonzalez,*
422 F.3d 897 (9th Cir. 2005) ............................................................ 47

*United States v. Gonzalez, Inc.,*
412 F.3d 1102 (9th Cir. 2005) .......................................................... 38

*United States v. Gregory,*
322 F.3d 1157 (9th Cir. 2003) .......................................................... 44

*United States v. Harris,*
999 F.3d 1233 (9th Cir. 2021) ............................................ 70-71, 71, 72

*United States v. Heckenkamp,*
482 F.3d 1142 (9th Cir. 2007) .......................................................... 16

*United States v. Henderson,*
649 F.3d 955 (9th Cir. 2011) ................................................ 72, 73, 75

*United States v. Henry,*
984 F.3d 1343 (9th Cir. 2021) .......................................................... 42

*United States v. Herrera,*
    444 F.3d 1238 (10th Cir. 2006) ........................................................ 32

*United States v. Holden,*
    908 F.3d 395 (9th Cir. 2018) ................................................... 71, 72

*United States v. Hong,*
    938 F.3d 1040 (9th Cir. 2019) ...................................................... 72

*United States v. Ippolito,*
    774 F.2d 1482 (9th Cir. 1985) ................................................. 40, 42

*United States v. Jordan,*
    256 F.3d 922 (9th Cir. 2001) .............................................. 73-74, 74

*United States v. Korte,*
    918 F.3d 750 (9th Cir. 2019) ...................................................... 29

*United States v. Koziol,*
    993 F.3d 1160 (9th Cir. 2021) ...................................................... 60

*United States v. Lapier,*
    796 F.3d 1090 (9th Cir. 2015) ................................................ *passim*

*United States v. Larkin,*
    510 F.2d 13 (9th Cir. 1974) ....................................................... 34

*United States v. Lennick,*
    18 F.3d 814 (9th Cir. 1994) ....................................................... 57

*United States v. Loveland,*
    825 F.3d 555 (9th Cir. 2016) .............................................. 52, 55, 58

*United States v. Mendoza,*
    25 F.4th 730 (9th Cir. 2022) .............................................. 57, 59

*United States v. Mikhel,*
    889 F.3d 1003 (9th Cir. 2018) ........................................ 46, 48, 49, 50

*United States v. Miller,*
425 U.S. 435 (1976) ........................................................................ 24

*United States v. Mincoff,*
574 F.3d 1186 (9th Cir. 2009) ....................................................... 57

*United States v. Moalin,*
973 F.3d 977 (9th Cir. 2020) ......................................................... 25

*United States v. Moe,*
781 F.3d 1120 (9th Cir. 2015) ................................................. 38, 56

*United States v. Myers,*
930 F.3d 1113 (9th Cir. 2019) ................................................. 42, 44

*United States v. Napier,*
463 F.3d 1040 (9th Cir. 2006) ........................................... 70, 76, 77

*United States v. Nevils,*
598 F.3d 1158 (9th Cir. 2010) ....................................................... 52

*United States v. Nora,*
765 F.3d 1049 (9th Cir. 2014) ..................................... 14, 33, 35, 37

*United States v. Olsen,*
21 F.4th 1036 (9th Cir. 2022) ....................................................... 43

*United States v. Paschall,*
988 F.2d 972 (9th Cir. 1993) ......................................................... 43

*United States v. Perkins,*
850 F.3d 1109 (9th Cir. 2017) ....................................................... 35

*United States v. Pineda-Doval,*
614 F.3d 1019 (9th Cir. 2010) ....................................................... 61

*United States v. Ramirez,*
714 F.3d 1134 (9th Cir. 2013) ....................................................... 59

*United States v. Ramirez,*
   976 F.3d 946 (9th Cir. 2020) ........................................................ 13

*United States v. Reeves,*
   210 F.3d 1041 (9th Cir. 2000) ........................................ 13-14, 14

*United States v. Ressam,*
   679 F.3d 1069 (9th Cir. 2012) ..................................................... 75

*United States v. Reyes,*
   18 F.4th 1130 (9th Cir. 2021) ...................................................... 77

*United States v. Rosacker,*
   314 F.3d 422 (9th Cir. 2002) ................................................ 73, 75

*United States v. Rowland,*
   464 F.3d 899 (9th Cir. 2006) ....................................................... 35

*United States v. Saini,*
   23 F.4th 1155 (9th Cir. 2022) ...................................................... 60

*United States v. Sandoval,*
   200 F.3d 659 (9th Cir. 2000) ............................................ 17, 26-27

*United States v. Seslar,*
   996 F.2d 1058 (10th Cir. 1993) ............................................. 31-32

*United States v. Spagnuolo,*
   549 F.2d 705 (9th Cir. 1977) ....................................................... 37

*United States v. Stephens,*
   424 F.3d 876 (9th Cir. 2005) ....................................................... 78

*United States v. Stinson,*
   647 F.3d 1196 (9th Cir. 2011) ..................................................... 60

*United States v. Taketa,*
   923 F.2d 665 (9th Cir. 1991) ....................................................... 26

*United States v. Underwood,*
    725 F.3d 1076 (9th Cir. 2013) ........................................................... 33

*United States v. Vallejos,*
    742 F.3d 902 (9th Cir. 2014) ........................................................... 70

*United States v. Villasenor,*
    608 F.3d 467 (9th Cir. 2010) ........................................................... 33

*United States v. Ward,*
    747 F.3d 1184 (9th Cir. 2014) ........................................................... 69

*United States v. Westinghouse Elec. Corp.,*
    638 F.2d 570 (3d Cir. 1980) ........................................................... 22

*United States v. Whitney,*
    673 F.3d 965 (9th Cir. 2012) ........................................................... 71

*Vachon v. New Hampshire,*
    414 U.S. 478 (1974) ........................................................... 53

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995) ........................................................... 19-20

*Virginia v. Moore,*
    553 U.S. 164 (2008) ........................................................... 26

*Webb v. Smart Document Sols., LLC,*
    499 F.3d 1078 (9th Cir. 2007) ........................................................... 18

*Whalen v. Roe,*
    429 U.S. 589 (1977) ........................................................... 22

**State Cases**

*King v. State,*
    535 S.E.2d 492 (Ga. 2000) ........................................................... 22

*State v. Skinner*,
   10 So.3d 1212 (La. 2009) ................................................................... 22


## Federal Constitution Provisions

U.S. Const. amend. IV ..................................................................... 16, 67
U.S. Const. amend. V ........................................................................... 69


## Federal Rules

9th Cir. R. 27-13 ..................................................................................... 8
Fed. R. App. P. 4 ................................................................................... 1
Fed. R. Crim. P. 29 ............................................................................. 10
Fed. R. Crim. P. 35 ............................................................................. 76


## Federal Statutes

5 U.S.C. § 552 ................................................................................. 18-19
18 U.S.C. § 2516 .................................................................................. 36
18 U.S.C. § 2518 ..................................................................... 36, 39, 40
18 U.S.C. § 3161 ............................................................................ 42, 43
18 U.S.C. § 3162 .................................................................................. 42
18 U.S.C. § 3173 .................................................................................. 44
18 U.S.C. § 3231 ................................................................................... 1
18 U.S.C. § 3553 ..................................................................... 75, 76, 78
18 U.S.C. § 3583 .................................................................................. 77
18 U.S.C. § 3742 ................................................................................... 1
21 U.S.C. § 813 .................................................................................... 53
21 U.S.C. § 841 ................................................................... 5, 53, 55, 61
21 U.S.C. § 846 .................................................................................... 55
28 U.S.C. §1291 ................................................................................... 1

**State Statutes**

Nev. Admin. Code § 453.520 ........................................................... 15

Nev. Admin. Code § 453.530 ........................................................... 15

Nev. Admin. Code § 453.540 ........................................................... 15

Nev. Admin. Code § 453.550 ........................................................... 15

Nev. Rev. Stat. § 49.215 ................................................................. 18

Nev. Rev. Stat. § 49.225 ................................................................. 19

Nev. Rev. Stat. § 453.164 ............................................................... 18

Nev. Rev. Stat. § 453.165 ......................................................... 25, 29

Nev. Rev. Stat. § 453.162 ............................................................... 15

Nev. Rev. Stat. § 639.0124 ............................................................. 18

Nev. Rev. Stat. § 639.0745 ............................................................. 18

Nev. Rev. Stat. § 629.061 ............................................................... 18

Nev. Rev. Stat. § 449A.112 ............................................................ 18

Nev. Rev. Stat. § 449.171 ............................................................... 18

Nev. Rev. Stat. § 453.589 ............................................................... 18

**United States Sentencing Guidelines**

U.S.S.G. § 2D1.1 ................................................................... 73, 74

U.S.S.G. § 3B1.1 ............................................................. 70, 71, 72

**Other Sources**

*Americans Consider Certain Kinds of Data to be More Sensitive than Others*,

    Pew Research Center ........................................................... 17

Arshack, Daniel, *Down the Rabbit Hole: The Federal Sentencing Guidelines Oxycodone to Marijuana Equivalency Calculation Is Arbitrary and Without Reason*,

    The Champion (Aug. 2015) ................................................... 73

*CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*,

    Centers for Disease Control and Prevention ..................................... 32

*Drugs and Supplements*,

    Mayo Clinic ................................................................................. 15

*Drugs, Herbs, and Supplements*,

    MedlinePlus ................................................................................. 15

*No Shortcuts to Safer Opioid Prescribing*,

    The New England Journal of Medicine ............................................ 32

*Prescription Drug Monitoring Programs (PDMPs)*,

Centers for Disease Control and Prevention ......................................... 30

Slovenko, Ralph, *Hippocratic Oath. Clinton DeWitt & Charles Thomas, Privileged Communications Between Physician and Patient*,

    37 Tex. L. Rev. 806 (1959) ................................................................. 18

## Jurisdictional Statement

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. § 3742.  Motley timely appealed.  7-ER-1739–40; Fed. R. App. P. 4(b)(1)(A)(i).

## Detention Status

Motley is incarcerated at FCI Lompoc with an estimated release date of February 7, 2032.

## Issues Presented

I.  Whether the district court erred pretrial by:

    A.  Denying Motley's motion to dismiss; and

    B.  Continuing trial for almost two years, violating Motley's speedy trial rights.

II.  Whether the district court erred during trial by denying Motley's:

    A.  *Batson* challenge;

    B.  Challenge to the government's insufficient evidence; and

    C.  Challenges to the jury instructions and verdict form.

III.  Whether the district court erred during sentencing by:

    A.  Applying an unsupported leadership enhancement;

B.     Failing to recognize its discretion to vary from the
        Guidelines based on policy;

C.     Incorrectly calculating drug weight;

D.     Imposing a substantively unreasonable carceral term; and

E.     Improperly delegating supervision determinations to
        probation, while including thirteen conditions in the written
        judgment not orally imposed.

## Relevant Statutes and Sentencing Guidelines

The attached Addendum contains the relevant sources.

## Statement of the Case

### I.     Officials surveilled Motley's movements over several months, then wiretapped Motley's phone.

#### A.     The state tracking warrant

Surveillance of Motley began in September 2018, when an officer
with the Reno Police Department (RPD) sought a warrant to track
Motley's car, based on a hearsay statement from an informant (CS-1),
information from Nevada's Prescription Monitoring Program (PMP),
and Motley's stale, overturned criminal history.  3-ER-573–88.

The officer recounted CS-1's statement, alleging Motley traveled from California every 30 days to obtain oxycodone prescriptions from a Reno doctor (later identified as Eric Math). 3-ER-574. But CS-1 lacked firsthand knowledge and could not say where the alleged meetings took place. 3-ER-574. And although the officer said CS-1 had "been proven reliable during the course of a controlled drug purchase," the officer provided no details. 3-ER-574. The officer omitted from the application that CS-1 was a longtime drug addict, who had been arrested twice for possession of a controlled substance and participated in the controlled purchase only to resolve a misdemeanor drug charge. 3-ER-596 n.1.

A different RPD officer obtained a report containing Motley's prescription information for the previous three years, showing Motley received prescriptions for oxycodone and tramadol, with a "morphine milligram equivalent" (MME) of 279 per day. 3-ER-573–74. The officer added the CDC "advises extra precautions" for doses above 50 MME and recommends "avoiding or carefully justifying" doses above 90 MME, but he did not include any authority connecting the CDC's advisements to his next statement—that "[t]he above prescription pattern can be an indicator for opioid abuse or diversion." 3-ER-575.

The state court granted a 90-day tracking warrant. 3-ER-581–88.

## B.    The federal tracking warrant

When the first tracking warrant expired, an FBI agent applied in federal court for a second. 3-ER-581–88, 590–604. Other than repeating the same information in the state tracking application, the federal application relied entirely on the results of the state warrant, a new PMP report for Motley, and PMP reports for people Motley met while under RPD surveillance. 3-ER-596–603.

A federal judge granted a 45-day tracking warrant. 3-ER-590–91.

## C.    The federal wiretap warrant

Federal authorities next asked the district court to authorize electronic surveillance of Motley's phone calls and text messages, along with further location tracking. 3-ER-606–717; 4-ER-719–24. For probable cause, the application relied on the previous two tracking warrant applications and evidence, information from three confidential informants (including CS-1), phone records, and prescription information for Motley and his alleged coconspirators. 3-ER-637–47, 650–85. In a section titled "need for interception," the government listed evidence it believed it could obtain with a wiretap. 3-ER-686–90.

And in the following section, the government listed less intrusive techniques it "used or considered." 3-ER-691–716.

The district court approved a 30-day surveillance and tracking warrant. 3-ER-606–717; 4-ER-719–24.

### D.    The indictment

Following the government's surveillance, Motley was indicted on seven counts: conspiracy to possess with intent to distribute and to distribute oxycodone and hydrocodone (Count One) and methamphetamine (Count Two) under 21 U.S.C. §§ 841 and 846,[1] and distribution of oxycodone (Counts Five, Six, Seven, and Ten) and hydrocodone (Count Thirteen) under 21 U.S.C. § 841. 4-ER-764–71.

## II.    Motley moved to suppress the evidence obtained from the warrants.

Motley moved to suppress the fruits of the searches, challenging: (1) law enforcement's warrantless search of his prescription records; (2) the wiretap application; and (3) omissions, speculation, and unreliable hearsay in the warrant affidavits. 3-ER-542–62. The district court

---

[1] Count Two was subsequently dismissed. Dist. Ct. Dkt. 232.

denied Motley's motion without an evidentiary hearing.  1-ER-99–117.

The court then continued the trial date three times over Motley's

objections, at the same time denying Motley's emergency motion to

reopen detention.  2-ER-345–419; 3-ER-420–85.  Consequently, Motley

remained detained until his trial began in May 2021, nearly two years

after his arrest.

## III.  Motley proceeded to trial and, after unsuccessfully challenging numerous errors, was convicted.

### A.  *Batson* challenge

During jury selection, the government used a preemptory strike to

remove potential juror S.G.-R., and defense counsel challenged the

strike as impermissibly based on race.  8-ER-843–46.  The government

responded that "[t]he first step in a *Batson* challenge is whether or not

the defense can show a pattern of removing a certain class of jurors.  In

this case they simply cannot."  8-ER-844.  And the government

explained the strike as "simply because of [S.G.-R.'s] age.  He is very

young, he is also unemployed."  8-ER-844.

Motley clarified "[t]he defense does not, in the first step of a

*Batson* challenge, have to demonstrate a pattern."  8-ER-845.  Motley

also objected that age does not present "a compelling or rationale for

6

striking somebody," especially given his "accomplished academic background." 8-ER-845. Moreover, Motley argued, unemployment in juror S.G.-R.'s demographic was not uncommon, and thus did not meaningfully contribute to the analysis. 8-ER-845.

The government responded by comparing S.G.-R. to seated juror C.E., pointing to C.E.'s employment history, education, and time in the community. 8-ER-846.

The district court agreed "youthfulness" was not a valid reason for the strike, finding it "more coincidental than anything else." 8-ER-846. And the court added "the pandemic has created [extended unemployment] with many people." 8-ER-847. But the court nevertheless rejected Motley's challenge because "a number of jurors who appeared to be Hispanic, or at least have some Hispanic relatives or relationships" were not excused by the government. 9-ER-228. The court therefore saw nothing "questionable about the exercise of [the] peremptory challenge." 9-ER-228.

## B. Trial testimony

At trial, the government relied largely on testimony from investigating agents and cooperating witnesses, including three of Motley's six codefendants, all of whom signed cooperation agreements.[2]

Math testified Motley asked him to prescribe narcotics to codefendants Jeanette, Kwoka, Elliott, and Motley. 5-ER-1035–36, 1039–40 (over 6,000 pills). Math handed two-thirds of the prescriptions to Motley, and one-third to the individuals issued the prescriptions themselves (with Elliott's all going through Motley). 5-ER-1043–44. Math received $600–$800 per prescription, save for Elliott who filled prescriptions for Math. 5-ER-1044–45. Math himself was addicted to pills and gambling. 5-ER-1048.

Elliott was also addicted to pills. 6-ER-1206. Elliott testified Motley introduced her to Math, and Elliott lied to Math saying she had a knee injury to obtain medication. 6-ER-1206, 1230. Motley took the prescriptions from Math and Elliott would fill them. 6-ER-1208. Elliott

---

[2] With this Opening Brief, Motley files provisionally under seal the three codefendant cooperation agreements. 9th Cir. R. 27-13(f).

would keep some, and often buy the remainder from Motley. 6-ER-1209. Elliott sometimes shared the pills with her mother, who was sick with multiple sclerosis and leukemia. 6-ER-1224–25.

Slater testified he was introduced to Motley to buy "a larger amount" of pain pills. 5-ER-1113. Slater testified he regularly purchased pills from Motley, 5-ER-1116, but had other suppliers, and was "supporting a pretty big habit" of his own, 5-ER-1143–46. The government also presented cooperating witness Michael Urie, who introduced Slater and Motley and purchased pills from both for personal use. 4-ER-941–43; 5-ER-983. Urie made four controlled pill buys for the FBI. 4-ER-945–50, 5-ER-959–974.

Among other exhibits, the government also introduced evidence of communications and purchases between Motley and his codefendants. *See generally*, GX1–11, 21–24, 31[3]; 6-ER-1423–25. Urie was not federally charged. 5-ER-980.

---

[3] Recordings of interactions among the codefendants and Urie were admitted at trial. Motley cites each as GX[exhibit number]. With this Opening Brief, Motley also files a Motion to Transmit these physical exhibits.

### C. Challenges at the close of evidence

Motley moved for acquittal under Fed. R. Crim. P. 29, as the evidence failed to show 1) a conspiratorial agreement or 2) Motley's knowledge the alleged drugs were controlled substances. 6-ER-1234–38. Motley similarly challenged the verdict form and proposed jury instructions regarding the mens rea element of the offenses, 6-ER-1262–65, 1293–94; and the proposed instruction for Count One as impermissibly deviating from the indictment, 6-ER-1258–61. Finally, Motley requested a multiple conspiracies jury instruction. 6-ER-1272.

The district court overruled Motley's challenges and denied a multiple conspiracies instruction. 6-ER-1239, 1265, 1273, 1294.

## IV. The district court imposed a 179-month sentence.

At sentencing, all agreed Motley was at criminal history I. 1-ER-16; Presentence Investigation Report (PSR), ¶ 89.

But the government and probation office calculated Motley's total offense level at 34, 2-ER-127–37; PSR, pp. 27–28, by attributing every prescribed pill to Motley (including those for codefendants' personal use), 2-ER-133–34, 138–39; PSR, ¶¶ 57–66, and insisting Motley was a leader or organizer, 2-ER-135–36, 139–41; PSR, ¶ 69 & pp. 31–32.

Motley objected and further challenged the Guidelines' drug equivalency calculation as based on flawed policy. 1-ER-20–21; PSR, ¶¶ 57–66 & p. 32. With an offense level 25, Motley argued an appropriate sentence was no greater than the high-end of his properly calculated range: 57 to 71 months' imprisonment. 2-ER-154–63. Motley pointed to numerous relevant sentencing factors, including his age, his ailing parents, his supportive family, and sentencing disparity. 2-ER-154–63.

The district court largely rejected Motley's arguments, calculated his Guidelines sentencing range at 151 to 188 months' imprisonment, and imposed a 179-month prison sentence and 5-year term of supervised release, leaving substance abuse treatment to probation's discretion. 1-ER-1–8, 11–54. In addition to special conditions concerning searches and gambling, the court stated, "Otherwise the conditions as required under the law are imposed." 1-ER-51–52. The written judgment, however, contains thirteen discretionary standard conditions of supervision not imposed by the court. 1-ER-6.

Of Motley's codefendants sentenced, Sampson received time served, and Slater and Elliott received probationary terms. Dist. Ct. Dkts. 325, 352, 373.

11

## Summary of the Argument

Myron Motley is serving nearly fifteen years' imprisonment for convictions unconstitutionally obtained.

The government built its case on three unconstitutional warrants—obtained through information warrantlessly gleaned from years of Motley's private, personal medical records—which allowed continuous surveillance of Motley's physical location, telephone conversations, and text messages.

After his arrest, excessive pretrial delay kept Motley sitting in custody without trial for nearly two years, violating his speedy trial rights.

The trial itself fared no better. During jury selection, the government's use of a race-based peremptory strike violated *Batson*, with the district court committing legal error in denying Motley's challenge. The government's insufficient evidence failed to show a conspiratorial agreement or that Motley possessed the requisite mens rea. The jury instructions and verdict inaccurately stated the mens rea element and constructively amended the indictment, and the court

erroneously failed to give a multiple conspiracies and specific unanimity instruction.

Finally, through numerous sentencing errors—including misapplying a leadership enhancement, miscalculating drug weight, and failing to recognize its full discretion to vary—the district court imposed a substantively unreasonable 179-month sentence. The court also erroneously imposed a substance treatment supervision condition, and the written judgment contains thirteen standard conditions the court unambiguously declined to impose.

## Argument

## I. Pretrial errors

### A. The district court erroneously denied Motley's motion to suppress.

#### 1. Standard of review

This Court reviews de novo the district court's decision on a motion to suppress and reviews for clear error the district court's factual findings. *United States v. Ramirez*, 976 F.3d 946, 951 (9th Cir. 2020). In addition, this Court "review[s] de novo a district court's denial of a *Franks* hearing" and "a district court's determination that probable cause existed for the issuance of a search warrant." *United States v.*

*Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000). "Whether probable cause is lacking because of alleged misstatements or omissions in the supporting affidavit is also reviewed de novo." *Id.*

When evidence included in a search warrant application is obtained as the result of officers' unlawful search, this Court must excise the tainted evidence and "determine whether the remaining untainted evidence was sufficient to support issuance of the warrant." *United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014). This review is without particular deference, as the issuing judge "made no determination about whether probable cause exists on the set of facts now before [this Court]." *United States v. Artis*, 919 F.3d 1123, 1132 (9th Cir. 2019). This Court must instead "determine on [its] own whether the remaining portions of the affidavit support a finding of probable cause." *Id.* (citation omitted).

> ## 2. The initial tracking warrant was based on an unconstitutional warrantless search and an unreliable informant's tip.

Investigators sought the initial tracking warrant based on Motley's medical information stored in Nevada's PMP database and a CI's hearsay tip. 3-ER-573–88. Neither basis was sound.

14

### a) The warrantless search through Motley's private medical records violated the Fourth Amendment.

The government's assertion of probable cause for the September tracking warrant relied heavily on a previous warrantless search through two and a half years of Motley's prescription records. 3-ER-574–76. The records stored in a PMP database can reveal a wealth of private medical information, including whether a patient is: (1) receiving hormone treatment for low testosterone or delayed puberty (testosterone and fluoxymesterone); (2) experiencing weight loss from AIDS or chemotherapy (dronabinol); (3) having difficulty conceiving (chorionic gonadotropin); (4) suffering from anxiety and panic disorders (alprazolam, lorazepam, meprobamate); or (5) treating alcohol withdrawal or opioid use disorder (buprenorphine, chlordiazepoxide, clorazepate, diazepam).[4] Nev. Rev. Stat. § 453.162; Nev. Admin. Code §§ 453.520, 453.530, 453.540, 453.550; *see Oregon Prescription Drug*

---

[4] *See Drugs, Herbs, and Supplements*, MedlinePlus, https://medlineplus.gov/druginformation.html; *Drugs and Supplements*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/; *Oregon PDMP*, 998 F. Supp. 2d at 961.

*Monitoring Program (PDMP) v. U.S. Drug Enf't Admin.*, 998 F. Supp. 2d 957, 960 (D. Or. 2014), *rev'd on other grounds*, 860 F.3d 1228 (9th Cir. 2017).

The government's warrantless intrusion into this protected information violated the Fourth Amendment.

### (1) Motley had a reasonable expectation of privacy in his medical records.

The Fourth Amendment protects against "unreasonable searches" of "persons, houses, papers, and effects."  U.S. Const. amend. IV; *see United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) (en banc) (defining "papers" to include electronic medical records).  Because Motley's subjective expectation of privacy in those papers "was one that society is prepared to recognize as reasonable," suppression of those records and the fruits of the tracking warrant is required.  *United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007) (citation omitted).

### (a) Motley had a subjective expectation of privacy in his medical records.

"The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of

16

those tests will not be shared with nonmedical personnel without their consent." *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001); *see Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004); *Oregon PDMP*, 998 F. Supp. at 964. Indeed, a Pew Research Center study revealed Americans rank the "state of [their] health and the medications [they] take" below only social security numbers as the most sensitive data. *Americans Consider Certain Kinds of Data to be More Sensitive than Others*, https://www.pewresearch.org/internet/2014/11/12/americans-consider-certain-kinds-of-data-to-be-more-sensitive-than-others/. Motley thus had a subjective expectation his private medical records would remain private. *Cf. United States v. Sandoval*, 200 F.3d 659, 660 (9th Cir. 2000) (reasoning defendant had subjective expectation of privacy in place he left prescription bottle).

> **(b) Motley's subjective expectation of privacy was objectively reasonable.**

There is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987). Instead, courts consider "such factors as the intention of the Framers of the Fourth Amendment"

17

and "our societal understanding that certain areas deserve the most scrupulous protection from government invasion." *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 178 (1984)). Considering those factors here, medical records go to the heart of the Fourth Amendment's protection. *See U.S. DOJ v. Ricco Jonas*, No. 19-1243 (1st Cir. June 20, 2019) (amicus brief detailing history of privacy protections for medical information).

The concept of medical privacy goes back centuries, at least to the time of the original Hippocratic Oath. Clinton DeWitt & Charles Thomas, *Privileged Communications Between Physician and Patient*, 37 Tex. L. Rev. 806, 806–07 & n.1 (1959); *see Oregon PDMP*, 998 F. Supp. 2d at 964. Legislatures across the country have enshrined privacy protections for medical information—including prescription records—in the statutory code. *See, e.g.*, Nev. Rev. Stat. §§ 639.0124, 639.0745, 629.061, 449.171, 453.589, 453.164(8)(a), 449A.112(2), 49.215. Congress, too, recognized the importance of medical privacy when it passed the Health Insurance Portability and Accountability Act (HIPAA) in 1996. *See Webb v. Smart Document Sols.*, LLC, 499 F.3d 1078, 1084 (9th Cir. 2007); *see also* 5 U.S.C. § 552(b)(6) (exempting

"medical files" from Freedom of Information Act).  And Nevada, like a
majority of states and the District of Columbia, codified the doctor-
patient privilege.  Nev. Rev. Stat. § 49.225.

These rules and statutes exist for a reason—medical records can
reveal intensely personal details about a patient's life.  *See Douglas v.
Dobbs*, 419 F.3d 1097, 1102 (10th Cir. 2005).  Specifically, records in
Nevada's PMP database can disclose information about patients' gender
identity, sexuality, sexually transmitted infections, mental health,
substance abuse struggles, and pregnancy status.  "It is difficult to
conceive of information that is more private or more deserving of Fourth
Amendment protection."  *Oregon PDMP*, 998 F. Supp. 2d at 966;
*Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1268–70
(9th Cir. 1998); *see Jaffee v. Redmond*, 518 U.S. 1, 10 (1996) (mental
illness); *Doe v. Att'y Gen. of U.S.*, 941 F.2d 780, 795–96 (9th Cir. 1991)
(HIV status and AIDS diagnosis), *disapproved of on other grounds by
Lane v. Pena*, 518 U.S. 187 (1996); *Smith v. City of Salem, Ohio*, 378
F.3d 566, 568–69, 575 (6th Cir. 2004) (gender dysmorphia); *Doe v. Se.
Pennsylvania Transp. Auth. (SEPTA)*, 72 F.3d 1133, 1138 (3d Cir. 1995)
(attempts to conceive); *see also Vernonia Sch. Dist. 47J v. Acton*, 515

U.S. 646, 658 (1995) (distinguishing urinalysis for drugs from urinalysis to determine "whether the student is, for example, epileptic, pregnant, or diabetic").

In accordance with this history, courts routinely hold patients maintain a protected privacy interest in their medical records. In *Ferguson v. City of Charleston*, the Supreme Court considered the constitutionality of a state hospital's warrantless drug screens of pregnant patients. 532 U.S. 67, 69–70 (2001). "The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital," the Supreme Court explained, "is that the results of those tests will not be shared with nonmedical personnel without her consent." *Id.* The Court emphasized the records were not turned over to any third party—they were turned over the law enforcement. *Id.* at 80–81. When the purpose of a warrantless search "is ultimately indistinguishable from the general interest in crime control," the search cannot withstand Fourth Amendment scrutiny. *Id.* at 81–86 (citation omitted).

This Court has also extended Fourth Amendment protections to medical records. In *Norman-Bloodsaw*, this Court held a publicly

funded research laboratory violated its employees' Fourth Amendment rights by testing their blood and urine for syphilis, sickle cell trait, and pregnancy, explaining "[t]he constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality." 135 F.3d at 1269. And in *Tucson Woman's Clinic v. Eden*, this Court struck down a regulation allowing warrantless searches of an abortion clinic, explaining patients have a "*heightened*" expectation of privacy in medical offices. 379 F.3d 531, 550–51 (9th Cir. 2004).

Other courts have come to the same conclusion. In *Douglas v. Dobbs*, the Tenth Circuit had "no difficulty concluding" that prescription drug information was private and protected. 419 F.3d 1097, 1102 (10th Cir. 2005).[5] Similarly, in *Doe v. Southeastern Pennsylvania Transp. Auth. (SEPTA)*, the Third Circuit concluded "a person's medical prescription record is within the ambit of information protected by the

---

[5] Despite concluding the plaintiff had a privacy right to her prescription records, the court rejected her Fourth Amendment claim on qualified immunity grounds not relevant here. *Douglas*, 419 F.3d at 1102–03.

Constitution." 72 F.3d 1133, 1137–38 (3d Cir. 1995); *see also United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980). In *State v. Skinner*, the Supreme Court of Louisiana concluded, "the right to privacy in one's medical and prescription records is an expectation of privacy that society is prepared to recognize as reasonable." 10 So.3d 1212, 1215–18 (La. 2009). And in *King v. State*, the Supreme Court of Georgia similarly held "a patient's medical information, as reflected in the records maintained by his or her medical providers, is certainly a matter which a reasonable person would consider to be private." 535 S.E.2d 492, 495. (Ga. 2000).

The cases the district court relied on here are inapposite. 1-ER-106–09. In *Whalen v. Roe*, the Supreme Court concluded New York's prescription monitoring program did not impermissibly invade the privacy interests of New York residents. 429 U.S. 589, 597–604 (1977). But the Supreme Court explicitly distinguished cases, like this one, involving "affirmative, unannounced, narrowly focused intrusions into individual privacy during the course of criminal investigations." *Id.* at 603–04 n.32; *see Ferguson*, 532 U.S. at 76–86.

And in *U.S. DOJ v. Utah Dep't of Com.*, the District of Utah ordered the state to disclose prescription drug information to the Drug Enforcement Administration in response to an administrative subpoena. No. 2:16-CV-611-DN-DBP, 2017 WL 3189868 (D. Utah July 27, 2017). But the court was considering an administrative subpoena, not law enforcement's unfettered access to private medical information. *See id.* at *6 (distinguishing *Ferguson* based on involvement of local law enforcement in policy). The court also relied on a Sixth Circuit decision concerning the privacy interests of pharmacists and distributors—not patients. *Id.* at *8 (citing *United States v. Acklen*, 690 F.2d 70, 75 (6th Cir. 1982)). And the court emphasized residents were voluntarily turning over prescription information to third parties, without the benefit of the Supreme Court's later decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). 2017 WL 3189868, at *8.

### (2) No exception excuses the government's warrantless search.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009)

(quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). None of the exceptions apply here.

### (a) Third-party doctrine

In two cases in the 1970s, the Supreme Court held documents provided to third parties may not be entitled to Fourth Amendment protections. *Smith v. Maryland*, 442 U.S. 735, 743–45 (1979); *United States v. Miller*, 425 U.S. 435, 442–44 (1976). But in *Carpenter v. United States*, the Court clarified the narrow contours of the doctrine. 138 S. Ct. 2206 (2018). Not every record revealed to a third party undermines the expectation of privacy in that record. *Id.* at 2220. Instead, courts must consider "the nature of the particular documents sought" and whether they were "voluntary[ily] expos[ed]." *Id.* at 2219–20.

As to the nature of Motley's information, PMP records share much in common with the cell-site records in *Carpenter*. Prescription records are "deeply revealing," *id.* at 2223, "provid[ing] an intimate window into a person's life," *id.* at 2217; *see Oregon PDMP*, 998 F. Supp. 2d at 967; *contra Smith*, 442 U.S. at 743 (distinguishing between content of calls and number dialed). By reviewing PMP records, the government can

ascertain sensitive information. *Supra*, p. 15. The records are comprehensive, showing any of hundreds of different prescriptions, prescribed by any doctor, anywhere in the state, going back several years. *See Carpenter*, 138 S. Ct. at 2217–18, 2223; *United States v. Moalin*, 973 F.3d 977, 992 (9th Cir. 2020). The data collection is automatic and "inescapable" for anyone who wants to participate in modern healthcare. *See Carpenter*, 138 S. Ct. at 2220, 2223. And law enforcement searches through the database are "remarkably easy, cheap, and efficient compared to traditional investigative tools." *Id.* at 2218. Instead of visiting individual pharmacies and doctors' offices in person, police can log on to the PMP website and obtain information about anyone in the state "[w]ith just the click of a button." *See id.* at 2218; Nev. Rev. Stat. § 453.165.

Further, prescription information, like cell-cite information, "is not truly 'shared' [voluntarily] as one normally understands the term," as transmission is an automatic aspect of receiving healthcare. *Carpenter*, 138 S. Ct. at 2220. Unless foregoing needed prescription treatments, patients cannot avoid sharing their information. "As a result, in no meaningful sense does the user voluntarily 'assume[ ] the

25

risk' of turning over" prescription information. *Id.* at 2220 (quoting *Smith*, 442 U.S. at 745) (alteration in original); *see Oregon PDMP*, 998 F. Supp. 2d at 967.

Providing medical information to medical providers does not undermine an objectively reasonable expectation that the private information will not be shared with law enforcement—"privacy does not require solitude." *United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991); *see Carpenter*, 138 S. Ct. at 2217; *cf. Tucson Woman's Clinic*, 379 F.3d at 550. And Motley, by providing medical information to doctors and pharmacists, was not taking the risk that information would be revealed to others—medical providers are forbidden by law and ethical obligations from doing so. *See DeMassa v. Nunez*, 770 F.2d 1505, 1506–07 (9th Cir. 1985).

As for law enforcement's access, lawmakers cannot legislate away an objectively reasonable expectation of privacy in nonpublic areas by simply giving police access to those areas; if they could, no statutes would ever be unconstitutional on Fourth Amendment grounds. *See Virginia v. Moore*, 553 U.S. 164, 172 (2008); *Ferguson*, 532 U.S. at 69–70; *California v. Greenwood*, 486 U.S. 35, 43 (1988); *cf. United*

26

*States v. Sandoval*, 200 F.3d 659, 660 (9th Cir. 2000) ("[W]e have previously rejected the argument that a person lacks a subjective expectation of privacy simply because he is engaged in illegal activity or could have expected the police to intrude on his privacy."). Under these circumstances, the third-party doctrine does not apply. *See Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013) (en banc), *aff'd sub nom. City of Los Angeles, Calif. v. Patel*, 576 U.S. 409 (2015).

### (b) Good faith

The Supreme Court created the exclusionary rule to "compel respect" for the Fourth Amendment's constitutional guaranty against unreasonable searches and seizures. *Davis v. United States*, 564 U.S. 229, 236 (2011). The rule applies when the benefits of suppression outweigh the societal costs, with its applicability resting on the culpability of the police conduct at issue. *Id.* at 237–38. When deliberate police conduct is at issue, "the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* at 238. Similarly, the government cannot justify a search pursuant to a statute if the statute's "provisions are such that a reasonable officer should have known that the statute was unconstitutional." *Illinois v. Krull*, 480

27

U.S. 340, 355 (1987); *see Michigan v. DeFillippo*, 443 U.S. 31, 37–39 (1979).

A reasonable officer should know a statute allowing indiscriminate searches through private medical records is unconstitutional. "It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980); *see Carpenter*, 138 S. Ct. at 2213; *Perez Cruz v. Barr*, 926 F.3d 1128, 1140 (9th Cir. 2019). Specifically concerning medical records, this Court, the Supreme Court, and other circuits have repeatedly held they are entitled to Fourth Amendment protections. *See, e.g.*, *Ferguson*, 532 U.S. at 81–86; *Tucson Woman's Clinic*, 379 F.3d at 550–51; *Norman-Bloodsaw*, 135 F.3d at 1269–70; *Douglas*, 419 F.3d at 1102. And although courts have begun considering the related question of administrative subpoenas for PMP records, no court has approved a statute like Nevada's, allowing warrantless searches, by law enforcement, with no judicial oversight, for the express purpose of

finding evidence of a crime.  *Contra United States v. Korte*, 918 F.3d 750, 759 (9th Cir. 2019).

### (c)    Closely regulated industry

The Supreme Court in *New York v. Burger* described the exception to the Fourth Amendment's warrant requirement "for administrative inspections of pervasively regulated industries."  482 U.S. 691, 693 (1987).  Neither this Court nor the Supreme Court has recognized primary care physicians and pharmacies as "pervasively regulated."  *See  Patel*, 576 U.S. at 424–26 (explaining exception limits).  And in *Tucson Woman's Clinic*, this Court rejected an argument that Arizona abortion clinics were pervasively regulated, emphasizing the heightened expectation of privacy in those clinics.  379 F.3d at 550–51.  In any event, for several additional reasons Nevada's statutory scheme fails to meet the requirements for the exception to apply.

Crucially, the search here involved law enforcement specifically looking for evidence of a crime, not an administrative inspection of a commercial business.  *See* Nev. Rev. Stat. § 453.165(4) (allowing PMP access for express purpose of "investigat[ing] a crime related to prescription drugs").  As both this Court and the Supreme Court have

repeatedly explained, warrantless search regimes are unconstitutional if the "primary purpose is ultimately indistinguishable from the general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 41–44 (2000); *see, e.g.*, *Patel*, 576 U.S. at 420; *Burger*, 482 U.S. at 702–03; *Perez Cruz*, 926 F.3d at 1139–40.

In addition, a warrantless search through prescription records is not "necessary to further the regulatory scheme." *Burger*, 482 U.S. at 702 (cleaned up). Almost every state has a prescription monitoring program, aimed at "improv[ing] opioid prescribing, inform[ing] clinical practice, and protect[ing] patients at risk." *Prescription Drug Monitoring Programs (PDMPs)*, Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/pdmp/index.html/. But states are able to accomplish these purposes without allowing law enforcement unfettered access through medical records. *See, e.g.*, *Oregon PDMP*, 998 F. Supp. 2d at 959–60; *see also Patel*, 576 U.S. at 427; *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 290 (6th Cir. 2018). And there is no risk the records held in a secure state database will disappear. *Contra Burger*, 482 U.S. at 710.

The state statute also provides no "constitutionally adequate substitute for a warrant" that "limit[s] the discretion of the inspecting officers." *Burger*, 482 U.S. at 703 (quoting *Donovan*, 452 U.S. at 603). There is no limitation on time, place, or scope. *Burger*, 482 U.S. at 703. There is no limitation on the subject of the search. *See Patel*, 576 U.S. at 427–28; *Liberty Coins*, 880 F.3d at 290. And there is no opportunity for the subject of the search "to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420–23; *contra U.S. DOJ v. Utah Dep't of Com.*, 2017 WL 3189868, at *6.

Finally, cases applying this exception do so when analyzing the privacy rights of the business owner, not the customer. When a business owner "chooses to engage in [a] pervasively regulated business," the owner does so "with the knowledge" that the business "will be subject to effective inspection." *United States v. Biswell*, 406 U.S. 311, 316 (1972). The *owner* therefore has a reduced expectation of privacy. *Id.*; *Burger*, 482 U.S. at 701–02. The same cannot be said for *customers* of that business (or, in this case, patients). *See United States v. Seslar*, 996 F.2d 1058, 1063 (10th Cir. 1993) ("[T]he closely regulated industry line of cases does not justify the warrantless search of

*un*regulated persons."); *see also United States v. Herrera*, 444 F.3d 1238, 1245–47 (10th Cir. 2006); *Anobile v. Pelligrino*, 303 F.3d 107, 121 (2d Cir. 2002).

> **b)** **Law enforcement made unjustified assumptions based on Motley's PMP records.**

The application for the initial tracking warrant asserted Motley's "prescription pattern can be an indicator for opioid abuse or diversion," purportedly based on a CDC guideline for opioid prescriptions. 3-ER-575. But the guideline—directed at physicians, not law enforcement—says no such thing. Instead, the guideline simply recommends certain benchmarks to prevent addiction and overdose. *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Centers for Disease Control and Prevention, https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm. And since its publication in 2016, the authors have plainly acknowledged the dosage thresholds have been wrongly and too rigidly interpreted. *No Shortcuts to Safer Opioid Prescribing*, the New England Journal of Medicine, https://www.nejm.org/doi/full/10.1056/NEJMp1904190.

"Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause." *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013). The affiant here improperly relied on conclusory, unscientific, and unsupported assumptions about Motley's medical records to justify an intrusive tracking warrant.

### c) No other evidence supports issuance of the tracking warrant.

Excising the unconstitutionally obtained PMP records, *see Nora*, 765 F.3d at 1058, only one thing remains in support of the initial tracking warrant—CS-1's tip. But CS-1 did not base the tip on personal knowledge. *Contra United States v. Villasenor*, 608 F.3d 467, 474 (9th Cir. 2010); *United States v. Bishop*, 264 F.3d 919, 925 (9th Cir. 2001). The police knew CS-1's identity, but nothing in the affidavit suggests they knew the wife's identity, which this Court has said weighs against credibility. *See, e.g.*, *United States v. Brown*, 925 F.3d 1150, 1153 (9th Cir. 2019).

While there is no absolute bar to hearsay in informant statements, no other circumstances here suggest reliability. *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986). Meeting with a

doctor and filling prescriptions at a pharmacy are both "wholly innocent" activities that do not provide probable cause for a warrant. *See United States v. Devita*, 526 F.2d 81, 83 (9th Cir. 1975). And the police did nothing to investigate and corroborate CS-1's bare conclusions that Motley was illegally selling the drugs he received. *See United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1297 (9th Cir. 1988); *United States v. Larkin*, 510 F.2d 13, 15 (9th Cir. 1974).

In addition, information included in the second warrant application but omitted from the first undermines CS-1's reliability: CS-1 participated in a controlled buy to avoid a misdemeanor charge for drug paraphernalia, was arrested twice for possessing methamphetamine, and provided the tip about Motley as "appreciat[ion]" for avoiding that misdemeanor charge. 3-ER-596 n.1.

A search based upon a warrant is invalid if the affidavit submitted in support of the warrant contains material omissions. *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010). A misrepresentation based on an omission is material when "the omitted facts 'cast doubt on the existence of probable cause.'" *Crowe*, 608 F.3d at 435 (citation omitted).

Adding the omissions regarding the CI's credibility back into the warrant affidavit here, it lacks probable cause—the CI was a criminal informant with a motive to fabricate evidence. *See United States v. Rowland*, 464 F.3d 899, 908 (9th Cir. 2006); *United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986).

Motley is entitled to relief on this claim. Alternatively, the district court erred denying Motley's request for a *Franks* evidentiary hearing. *See United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017).

### 3. The second tracking warrant was based on the unconstitutional fruits from the improper initial warrant.

After the first tracking warrant expired in December 2018, federal law enforcement applied for a second tracking warrant, using the fruits from the first warrant and additional PMP data. 3-ER-590–604. Because the second warrant could not have issued without unconstitutional searches, the fruits from that warrant must also be suppressed. *See Nora*, 765 F.3d at 1058.

### 4. The wiretap order did not comply with federal surveillance law.

Federal law "prohibits electronic surveillance by the federal government except under carefully defined circumstances." *United*

*States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001). The government must justify a warrant by establishing probable cause the subject has committed an enumerated offense, along with a showing that electronic surveillance is needed over any less intrusive means. 18 U.S.C. §§ 2516, 2518(3). These procedural steps "require 'strict adherence,' and 'utmost scrutiny must be exercised to determine whether wiretap orders conform to [the law].'" *Blackmon*, 273 F.3d at 1207 (citation omitted). "The legislative purpose is plain: 'The protection of privacy was an overriding congressional concern.'" *Chandler v. U.S. Army*, 125 F.3d 1296, 1298 (9th Cir. 1997) (citation omitted).

The government failed to adhere to these requirements.

### a) Probable cause

The government accused Motley of participating in a drug trafficking organization. To support that allegation, the government relied on five categories of information: (1) the information contained in the two previous warrant applications, (2) the evidence obtained from those two tracking warrants, (3) information from three confidential informants (including the original informant who provided information

36

to RPD), (4) phone records, and (5) prescription information for Motley and his alleged coconspirators. 3-ER-637–47, 650–85. For the reasons already discussed, the information contained in the two previous warrant applications, the evidence obtained from those two warrants, and the prescription information were all improper sources of probable cause for the wiretap warrant. *See Nora*, 765 F.3d at 1058; *United States v. Spagnuolo*, 549 F.2d 705, 712 (9th Cir. 1977). The two categories remaining were similarly insufficient.

The wiretap affidavit referred to the three confidential informants as CS-1, CS-2, and CS-3. CS-1 is the same informant who provided information used in the initial tracking warrant affidavit. 3-ER-643–45. Although CS-1 provided additional information to support the wiretap application, the affidavit did not reveal whether—unlike with the previous tip—CS-1 received that information first-hand. 3-ER-643–45. CS-2 and CS-3 agreed to cooperate with the FBI to avoid felony charges after drugs were discovered in their car. 3-ER-645–47. CS-2 participated in controlled purchases of small amounts of oxycodone from Motley. 3-ER-667–73, 676–77. And CS-3 participated in controlled purchases of small amounts of oxycodone from Slater. 3-ER-673–76.

The phone records merely corroborated that these meetings happened, along with other calls between Motley and his codefendants. 3-ER-667–84.

Crucially, none of the informants or phone records provided probable cause Motley was participating in an operation the scope of which required the invasive step of electronically surveilling the contents of phone calls and text messages. Instead, the affidavit outlined only a series of isolated sales, which fail as a matter of law to constitute a conspiracy. *See United States v. Moe*, 781 F.3d 1120, 1125 (9th Cir. 2015); *see also Rogers v. United States*, 340 U.S. 367, 375 (1951) ("[A]t least two persons are required to constitute a conspiracy."). The affidavit's conclusory allegations of a larger drug trafficking organization were insufficient to support the warrant. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983).

### b) Necessity

"To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity." *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005). The necessity showing requires the government to prove

"normal investigative procedures have been tried and have failed or reasonable appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). By the time of its wiretap application, the government had all it needed to prosecute Motley on the drug distribution counts. The government failed to show "normal investigative procedures" were insufficient to provide evidence of conspiracy.

Several investigative techniques were available to the government. Investigators could have spoken to CS-1's spouse, who allegedly had received a prescription through Motley from Math.[6] Investigators could have persuaded Motley's purported coconspirators to cooperate—something they were able to easily accomplish after filing charges. *See* 3-ER-696 (complaining about the lack of evidence supporting charges against Math). They could have obtained

―――――――――――――

[6] The affidavit asserted CS-1's spouse, who was addicted to opioids, was unwilling to cooperate and lose her source of prescription pills, but it is not clear from the affidavit whether investigators contacted her or merely assumed she would refuse. *See* 18 U.S.C. § 2518(1)(c) (requiring "full and complete statement" on necessity). In any event, law enforcement regularly obtain cooperation from addicts by threatening prosecution.

traditional search warrants for property and financial records. *See* 3-ER-696, 702–04, 714–15 (complaining investigators were unsure where drugs were being stored and how proceeds were being used). They could have surveilled Motley and his codefendants at Reno casinos. *See* 3-ER-714–15 (complaining investigators were unsure whether Motley and Math were laundering drug proceeds at casinos). And they could have sent an undercover officer to Math's office, posing as a patient. *See generally* 3-ER-686–716 (complaining of lack of evidence of Math's complicity). The government's dismissal of these techniques as "insufficient to achieve the objectives of the investigation" or possibly "place [informants] in danger" is conclusory boilerplate this Court has regularly rejected in warrant applications. *See, e.g.*, *Blackmon*, 273 F.3d at 1210–11; *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985). And the government's conclusions that the "risks … outweigh the benefits" additionally misstates the law permitting wiretaps only when all other investigative avenues are unavailable. 18 U.S.C. § 2518(3)(c).

In addition to unreasonably rejecting of these avenues, the government overstated the contours of the alleged conspiracy to

manufacture necessity and understated the evidence uncovered up to

that point.  For instance, the affidavit complained investigators did not

know other members of the conspiracy, 3-ER-696, 699–700, 711, but

there were no other high-ranking members charged.[7]  The affidavit

complained investigators did not know how the alleged conspirators

were obtaining prescriptions, 3-ER-696, 700, despite ample evidence

Math was the source.  *See* 3-ER-700 (questioning with no evidentiary

basis whether pharmacy employees are complicit in the conspiracy).

The affidavit complained investigators were unaware "how drugs and

currency are moved from one location to another," 3-ER-702, despite the

evidence already uncovered during the controlled drug purchases.  And

the affidavit assumed without any factual basis members of the alleged

conspiracy "distribute[d] drug proceeds," operated "stash locations," and

hid assets.  3-ER-700, 711–15.  The government "may not cast its

investigative net so far and wide as to manufacture necessity in all

_____

[7] The indictment added only Elliott to the conspiracy charge, a
low-level participant who ultimately received probation for her role in
the offense.

circumstances." *Blackmon*, 273 F.3d at 1211; *see Ippolito*, 774 F.2d at 1486.

## B. The district court violated Motley's right to a speedy trial.

### 1. Standard of review

This Court reviews factual findings concerning the Speedy Trial Act and Sixth Amendment's speedy trial protections for clear error and questions of law regarding their interpretation de novo. *United States v. Henry*, 984 F.3d 1343, 1349–50 (9th Cir.), *cert. denied*, 142 S. Ct. 376 (2021); *United States v. Myers*, 930 F.3d 1113, 1118 (9th Cir. 2019). "A district court's finding of an ends of justice exception will be reversed only if there is clear error." *Henry*, 984 F.3d at 1350.

### 2. Speedy Trial Act

The Speedy Trial Act requires a trial no later than 70 days after an indictment is filed or a defendant makes an initial appearance. 18 U.S.C. § 3161(c)(1). If the government fails to abide by these time limits, the Act requires dismissal of the indictment. 18 U.S.C. § 3162(a)(2). Here, trial began nearly two years after the indictment was filed.

42

Relying on the "ends of justice" exclusion to the Speedy Trial Act, 18 U.S.C. § 3161(h)(7), the district court excused the delay in this case because of the Covid-19 pandemic.  2-ER-345–48, 372–73, 382–85.  But only the first continuance was issued during the lockdowns caused by the pandemic.  2-ER-382–85.

Though in *United States v. Olsen*, this Court reversed the district court's dismissal of indictment with prejudice under the Speedy Trial Act, its reasoning does not control here.  21 F.4th 1036, 1046–47 (9th Cir. 2022).  Unlike in *Olsen*, the district court issued the second and third continuances for reasons separate from the general suspension of jury trials.  *Compare id.* at 1042, *with* 2-ER-345–48, 372–73.  The defendant in *Olsen* was out of custody, while Motley was detained.  *Olsen*, 21 F.4th at 1042.  And the government in *Olsen* requested a single opposed continuance of less than two months, while the court here continued Motley's trial over his objection for more than a year.  *See Olsen*, 21 F.4th at 1042; *see also Furlow v. United States*, 644 F.2d 764, 767–69 (9th Cir. 1981) (approving 14-day continuance); *United States v. Paschall*, 988 F.2d 972, 973–75 (9th Cir. 1993) (approving 8-day continuance).

43

### 3. Sixth Amendment

The Sixth Amendment separately guarantees federal defendants the right to a speedy trial. 18 U.S.C. § 3173; *Betterman v. Montana*, 578 U.S. 437, 442 (2016). To determine whether delay violates the Sixth Amendment, courts consider the defendant's assertion of the right, along with the length of delay, the reason for delay, and prejudice. *Barker v. Wingo*, 407 U.S. 514, 530–33 (1972). Motley clearly meets the first factor—he asserted his right to a speedy trial before each of the three continuances. 2-ER-357, 381, 389. And consideration of the other three factors show Motley is entitled to relief.

The length of delay here was substantial. Motley was indicted on May 23, 2019. On April 20, 2020, the government filed its first opposed motion for a continuance. 2-ER-408–19. The first day of Motley's trial was May 3, 2021, more than a year later. Courts regularly conclude similar lengths of time sufficient for the speedy-trial inquiry. *See, e.g.*, *United States v. Myers*, 930 F.3d 1113, 1122 (9th Cir. 2019) (22 months); *United States v. Gregory*, 322 F.3d 1157, 1162 (9th Cir. 2003) (22 months); *see also Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)

44

(noting lower courts generally find one-year delay sufficient to require further inquiry).

The delay was primarily attributed to the Covid-19 pandemic, although only a portion of the delay was due to the district's suspension of jury trials. *See* 2-ER-372–73 (ordering continuance in part because of "unusually full" trial calendar). Although "[a] more neutral reason such as negligence or overcrowded courts" is weighted less heavily than deliberate governmental delay, it "nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531.

As for prejudice, the speedy trial right is designed to prevent exactly the type of lengthy pretrial incarceration Motley experienced. *Barker*, 407 U.S. at 532–33. Particularly relevant here, Motley spent that year of delay incarcerated during a global pandemic, with disease running rampant through jails and prisons. *See Barker*, 407 U.S. at 532–33 (noting anxiety and concern are proper prejudice considerations). And during that year, Motley had little opportunity to meet with counsel and assist in his own defense, given the protocols in

45

place to reduce the spread of illness. *See id.* at 533. Although

"excessive delay presumptively compromises the reliability of a trial in

ways that neither party can prove or, for that matter, identify," *Doggett*,

505 U.S. at 655, concrete prejudice here justifies relief.

## II. Trial errors

### A. The government's race-based use of a peremptory strike violated *Batson*.

#### 1. Standard of review

This Court generally reviews the district court's ruling on a

*Batson* challenge for clear error. *United States v. Alvarez-Ulloa*, 784

F.3d 558, 565 (9th Cir. 2015). However, this Court applies de novo

review where the court improperly applied *Batson*'s three-step

framework. *Id.*

#### 2. Erroneous *Batson* denial

"Purposeful racial discrimination in selection of the venire violates

a defendant's right to equal protection because it denies him the

protection that a trial by jury is intended to secure." *United States v.*

*Mikhel*, 889 F.3d 1003, 1028 (9th Cir. 2018) (citation omitted);

*see also Powell v. Ohio*, 499 U.S. 400, 409, 415 (1991) (explaining *Batson*

also protects removed juror's equal protection rights). "The

46

Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019).

A three-step framework applies to *Batson* challenges. First, a defendant must make a prima facie showing that the government exercised a peremptory challenge on the basis of race. *Batson*, 476 U.S. 79, 86 (1986). Then the government must offer a race-neutral reason for striking the juror. *Id.* Finally, the trial court must determine whether the defendant has shown purposeful discrimination. *Id.* Because the district court reached step three of the analysis, that is the only step at issue here. *See United States v. Esparza-Gonzalez*, 422 F.3d 897, 906 (9th Cir. 2005).

### a) Wrong legal standard below

Once the prosecutor provides a race-neutral reason for striking the juror at issue, "the trial court has a duty to proceed to step three to answer the critical question of whether the prosecutor's justifications for peremptory strikes are persuasive." *United States v. Alanis*, 335 F.3d 965, 967 (9th Cir. 2003). At the third step, "the trial court must decide not only whether the reasons stated are race-neutral, but

47

whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination." *Mikhel*, 889 F.3d at 1029. The district court committed three legal errors at step three.

***First,*** the district court found the lack of a pattern of discriminatory strikes dispositive. But whether the defendant shows a pattern of improper strikes goes to step one. *See Shirley v. Yates*, 807 F.3d 1090, 1102 (9th Cir. 2015), *as amended* (Mar. 21, 2016); *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002). Here, the parties had already proceeded to step three.

***Second***, "[a] pattern of exclusionary strikes is not necessary" for a *Batson* violation. *Fernandez*, 286 F.3d at 1078; *see Flowers*, 139 S. Ct. at 2244. Here, the district court discounted the government's proffered reasons as to age, 1-ER-97 (finding it "more coincidental than anything else"), and unemployment, 1-ER-98 ("Unfortunately, the pandemic has created that situation with many people."). But looking for a pattern, the court then "note[d] among the jury there were a number of jurors who appeared to be Hispanic, or at least have some Hispanic relatives

or relationships." 1-ER-98. Although a pattern can provide evidence supporting a defendant's *Batson* challenge, its absence is not dispositive: "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers*, 139 S. Ct. at 2244.

**Third,** the district court failed to meaningfully evaluate the government's proffered reasons. The district court "cannot simply accept the prosecutor's reasons as facially neutral and stop there; it must make an explicit determination at the third step." *Alvarez-Ulloa*, 784 F.3d at 565; *United States v. Alanis*, 335 F.3d 965, 968–69 (9th Cir. 2003). But, after finding unpersuasive the government's reasons for striking S.G.-R., the court nonetheless rejected Motley's challenge because the government did not strike other Hispanic jurors or jurors with connections to Hispanic individuals. 1-ER-97–98. De novo review is warranted.

### b) Purposeful discrimination

For step three, Motley does not have to prove "all of the prosecutor's race-neutral reasons were pretextual, or even that the racial motivation was determinative." *Mikhel*, 889 F.3d at 1029. Instead, he need only prove by a preponderance of the evidence "that

race was a substantial motivating factor in the prosecutor's use of the peremptory strike." *Id.*; *Currie v. McDowell*, 825 F.3d 603, 605 (9th Cir. 2016). "A prosecutor's motive may be inferred from the totality of the relevant facts," *McClain v. Prunty*, 217 F.3d 1209, 1220 (9th Cir. 2000), including by showing through comparative juror analysis "that facially race-neutral reasons are a pretext for discrimination." *Id.* at 1220–21; *see Miller-El v. Cockrell*, 537 U.S. 322, 338–39 (2003); *Alanis*, 335 F.3d at 969.

The government gave two reasons for striking S.G.-R—age and unemployment. 4-ER-844. But the government failed to "relate[]" this explanation "to the particular case to be tried" against Motley, *Batson*, 476 U.S. at 98, stating only its "belie[f] that he would be the best strike use for us." 4-ER-844. There was simply no "nexus" between S.G.-R.'s age or unemployment and the government's "possible approach to the specific trial." *United States v. Bishop*, 959 F.2d 820, 825 (9th Cir. 1992), *overruled on other grounds by United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc); *see Cockrell*, 537 U.S. at 339; *see also Shirley*, 807 F.3d at 1111 n.26 ("Vague preferences are particularly likely to conceal implicit bias.").

Moreover, other jurors with S.G.-R.'s characteristics went unchallenged. S.G.-R. was 22 years old, but E.G. (33 years), C.E. (35 years), and B.W. (31 years) were also young. *Sealed*-9-ER-1970, 1990, 1996, 2026. Further, C.F., C.C., L.T., and C.D. were similarly unemployed, yet went unchallenged. 4-ER-830, 837; *Sealed*-9-ER-1976, 1986, 1988, 2022. Comparative juror analysis provides persuasive evidence the government's racially neutral reasons were pretext for discrimination. *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); *Alanis*, 335 F.3d 965.

The government compared S.G.-R. to C.E., pointing to C.E.'s education (bachelor's degree), length of employment (fifteen years in the computer field) and length of time in the community (approximately eight years). But again, the government failed to explain the import of these characteristics. *Batson*, 476 U.S. at 98. And the government did not challenge numerous other jurors who had not obtained a bachelor's degree. 4-ER-832–34, 836, 838 (L.S., L.T., C.C., T.S., and B.W.).

Further, though S.G.-R. became unemployed at the start of the Covid-19 pandemic, he had previously worked in a supervisor position. 4-ER-840. The record does not reflect his length of employment. *See*

51

*United States v. Chinchilla*, 874 F.2d 695, 698 (9th Cir. 1989) (declining to consider proffered basis where the record did not contain relevant information for comparison). And S.G.-R. had lived in Reno for the past nineteen years, *eleven years longer* than C.E. 4-ER-840. Thus, it is unclear how either characteristic persuasively served as a nondiscriminatory reason to strike S.G.-R.

The record here demonstrates by a preponderance of the evidence that S.G.-R.'s race was a substantial motivating factor in the prosecution's decision to remove him from Motley's jury. This Court should vacate the conviction and sentence, and remand for a new trial.

## B. Insufficient evidence supported the verdict.

### 1. Standard of review

This Court "review[s] de novo claims of insufficiency of the evidence." *United States v. Loveland*, 825 F.3d 555, 558 (9th Cir. 2016). This Court views "the evidence in the light most favorable to the prosecution," asking whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (emphasis omitted) (en banc). Without "relevant evidence as to a crucial element,"

the conviction "violates due process." *Vachon v. New Hampshire*, 414 U.S. 478 (1974).

## 2. Knowledge

The Controlled Substance Act prohibits the "knowing[] or intentional[]" "manufacture, distribut[ion], or dispens[ing], or possess[ion] with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). "Under the most natural reading of this provision, the word 'knowingly' applies not just to the statute's verbs but also to the object of those verbs—'a controlled substance.'" *McFadden v. United States*, 576 U.S. 186, 191 (2015); *see United States v. Collazo*, 984 F.3d 1308, 1326 (9th Cir. 2021) (en banc). "That suggests that a defendant needs to know more than the identity of the substance; he needs to know that the substance is *controlled*." *McFadden*, 576 U.S. at 198 (Roberts, C.J., concurring).[8]

---

[8] To the extent *McFadden* suggested knowledge of a substance's identity satisfies § 841(a)(1)'s mens rea requirement, such statements were "not necessary" to the Supreme Court's ultimate conclusion in *McFadden* regarding the Analogue Act, 21 U.S.C. § 813, and "should therefore not be regarded as controlling." *McFadden*, 576 U.S. at 199 (Roberts, C.J., concurring).

Accordingly, this Court has "long recognized the basic rule that a defendant charged with a controlled substance offense need not know the exact nature of the substance with which he was dealing, but must "believe[] he has *some* controlled substance in his possession." *Collazo*, 984 F.3d at 1327 (citation and internal quotation marks omitted).

Here, the government's circumstantial evidence suggested Motley possibly knew the *name* of the drugs at issue, not of their *controlled* status. And while knowledge of a substance's identity "can be compelling evidence that he knows the substance is controlled," not so here. *McFadden*, 576 U.S. at 198 (Roberts, C.J., concurring) (suggesting it may not be well-known that hydrocodone is controlled); *see also* 4-ER-904–06. The evidence did not reflect Motley had previously been arrested for oxycodone or hydrocodone, sufficient to infer notice of their controlled status. *See McFadden*, 576 U.S. at 192 n.1. And Motley received the prescriptions from a licensed medical doctor.

Nor did the evidence strongly reflect Motley "conceal[ed] . . . his activities" or exhibited "evasive behavior with respect to law enforcement." *McFadden*, 576 U.S. at 192 n.1. For example, in one call,

*Kwoka* aired concerns about illegality—not Motley. 6-ER-1399–1400; GX5. In other calls, *Jeanette* appeared to speak in code and/or limited language—again, not Motley. 6-ER-1404 (Jeanette stating he would tell Motley more in-person rather than by phone, and Motley replying, "You know, I don't care, it ain't that serious to me"), *see also* 6-ER-1405, 1412; GX6, GX7. Regardless of *others'* knowledge, this evidence did not prove the mens rea element as to *Motley*.

The government's failure to prove the requisite knowledge element under § 841(a)(1) requires reversal of the distribution counts. And because conspiracy under § 846 requires the government to prove "the defendant's mental state was the same as if the defendant had been charged with the underlying offense," *Collazo*, 984 F.3d at 1333, this evidentiary failing also requires reversal of Count One's conspiracy charge.

### 3. Agreement

"Conspiracy is an agreement to commit a crime, and the intent to commit the underlying offense." *Loveland*, 825 F.3d at 559; 21 U.S.C. § 846; *see United States v. Lapier*, 796 F.3d 1090, 1095 (9th Cir. 2015). The government must "establish not only the opportunity but also the

actual meeting of minds.  Mere association and activity with a conspirator does not meet the test." *Lapier*, 796 F.3d at 1095 (citation omitted).  "At minimum, the government must 'show that each defendant knew or had a reason to know of the scope of the conspiracy and that each defendant had reason to believe that their own benefits were dependent upon the success of the entire venture.'" *Collazo*, 984 F.3d at 1319 (citation omitted).

This Court must conduct a "fact-intensive and context dependent inquiry" into whether buyers and sellers agreed to "further distribute the drug in question," considering a number of non-exhaustive factors:

> whether the drugs were sold on credit or on consignment; the frequency of sales; the quantity of drugs involved; the level of trust demonstrated between buyer and seller, including the use of codes; the length of time during which sales were ongoing; whether the transactions were standardized; whether the parties advised each other on the conduct of the other's business; whether the buyer assisted the seller by looking for other customers; and whether the parties agreed to warn each other of potential threats from competitors or law enforcement.

*Moe*, 781 F.3d at 1124–26 (footnotes omitted).

Here, these factors do not support conspiracy with his codefendants.  Motley was not "fronting"—i.e., making sales based on

56

credit. *Cf. United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009). For example, when Slater wanted to make a purchase from Motley, he would first "[g]ather the money," and then arrange to meet for the sale. 5-ER-1116–17, 1129; 1390. Elliott also paid Motley upfront for pills, 6-ER-1213–15, 1218, 1414–18, 1423–35, and Motley paid Elliott upfront for filling prescriptions by immediately giving her a "share of the pills." 6-ER-1208–09.

Mere "proof that a defendant sold drugs to other individuals does not prove the existence of a conspiracy." *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994); *see United States v. Mendoza*, 25 F.4th 730, 736 (9th Cir. 2022). Even if Motley "gave drugs to other people *knowing* they would further distribute them," the trial evidence does not demonstrate he "had an agreement with these individuals" to do so. *Lennick*, 18 F.3d at 819 (emphasis added); *see* 5-ER-1144 (Slater was both using and dealing, and had multiple suppliers). In fact, Motley explicitly stated he was *not* interested in having Elliott sell to her friends so he could earn her business, 6-ER-1214, 1231, 1419–20. Motley lacked a "shared stake" in what Slater, Elliott, Kwoka, Jeanette,

or Sampson did "with the goods, show[ing] the absence of a conspiracy." *Loveland*, 825 F. 3d at 562.

Math, too, had no shared stake in Motley's actions. Math testified he was paid money per prescription written, except for Elliott who would fill prescriptions for Math. 5-ER-1044–45, 1050. Math did not testify to having any interest in or agreement to further distribution of the filled prescriptions. And though Math suspected his codefendants were not taking all prescribed pills themselves, he did not actually know. 5-ER-1039–40; *Loveland*, 825 F.3d at 562. There "was also no evidence here of high pressure sales by [Math], which might support an agreement to redistribute. [Motley] called [Math]; [Math] did not call [Motley]. [Math] offered no incentives for redistribution." *Loveland*, 825 F.3d at 562; 5-ER-1035–36, 1043.

Certainly, the government alleged repeated transactions over the period of the conspiracy, involving a not insignificant quantity of pills. *See, e.g.,* 5-ER-1035–43. But this Court has expressed skepticism that even "'regular' purchases on 'standard' terms can transform a customer into a co-conspirator." *Loveland*, 825 F.3d at 563 (citation omitted). Selling "large quantities of controlled substances, without more, cannot

58

sustain a conspiracy conviction." *United States v. Ramirez*, 714 F.3d
1134, 1140 (9th Cir. 2013) (citation omitted). Ultimately, viewing the
trial evidence in the government's favor, the government failed to prove
the requisite agreement element of conspiracy beyond a reasonable
doubt, requiring reversal. *Mendoza*, 25 F.4th at 740.

### C. The district court committed numerous errors when instructing the jury.

#### 1. Standards of review

Defendants have "a constitutional right to have the jury
instructed according to [their] theory of the case, provided that the
requested instruction is supported by law and has some foundation in
the evidence." *United States v. Anguiano-Morfin*, 713 F.3d 1208, 1209
(9th Cir. 2013) (citation omitted). This Court "review[s] de novo
whether an instruction is 'supported by law'" and "for an abuse of
discretion whether it has 'some foundation in the evidence.'" *Id.*
(citations omitted). Where the district court declined to "give a
defendant's requested instruction that is supported by law and has
some foundation in the evidence," and "other instructions, in their
entirety" fail to "adequately cover that defense theory," the error
"warrants per se reversal." *Id.* (citation omitted).

This Court also "review[s] de novo whether the jury instructions accurately define the elements of a statutory offense," *Collazo*, 984 F.3d at 1318, but "review[s] the formulation of jury instructions for abuse of discretion." *United States v. Koziol*, 993 F.3d 1160, 1179 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1372 (2022). "The omission of an element from jury instructions" requires reversal, unless this Court finds beyond a reasonable doubt that "the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *United States v. Saini*, 23 F.4th 1155, 1163 (9th Cir. 2022) (citation omitted).

This Court reviews instructional challenges for plain error if "the defendant fail[ed] to request an instruction." *Koziol*, 993 F.3d at 1179. Plain error "relief is warranted where the district court committed (1) error that (2) is plain; (3) 'affected substantial rights;' and (4) 'seriously affected the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (citation omitted).

This Court "treat[s] verdict forms like jury instructions." *United States v. Stinson*, 647 F.3d 1196, 1218 (9th Cir. 2011). "To determine whether the jury was misled, [this Court] must consider the

instructions and the verdict form together." *United States v. Pineda-Doval*, 614 F.3d 1019, 1031 (9th Cir. 2010).

### 2. Mens rea

The district court "fail[ed] to properly instruct the jury regarding an element of the charged crime"—mens rea—thereby "commit[ting] a constitutional error that deprive[d Motley] of due process." *Conde v. Henry*, 198 F.3d 734, 740 (9th Cir. 1999) (citation and internal quotation marks omitted), *as amended* (Jan. 27, 2000). *Supra*, pp. 53–54 (discussing § 841(a)(1)'s requirements). The verdict form contained the same legal error. 2-ER-187–88.

Specifically, Motley requested the district court instruct the jury to convict only if the government proved Motley knew the charged drug "was a federally controlled substance." 2-ER-264; 6-ER-1262. Motley objected to the proposed verdict form on the same grounds. 6-ER-1293–94.

Over defense objection, however, the district court permitted the jury to find culpability merely based on knowledge of the *type* of substance alone, regardless of whether Motley necessarily knew its *controlled* nature. 6-ER-1293. The court's instructions and verdict form

erroneously omitted the requisite mens rea element that Motley knew the substances were controlled.  2-ER-187–88, 211–16.

The government cannot show harmlessness from these errors. Given the dearth of trial evidence supporting Motley's knowledge, *supra*, pp. 54–55, this Court cannot say overwhelming evidence would nevertheless have supported the jury concluding beyond a reasonable doubt Motley knew oxycodone or hydrocodone to be Schedule II substances.  This Court should reverse the convictions.

### 3.  Specific unanimity

The district court plainly erred by failing to give a specific unanimity jury instruction.  "While jurors need not unanimously agree on the particular facts satisfying the *overt act* element of a conspiracy charge, jurors must still unanimously agree that the defendant is guilty of participating in a particular conspiracy—i.e., of forming an agreement with at least one other particular individual to pursue a particular criminal goal." *Lapier*, 796 F.3d at 1096 (citations omitted). "Normally, a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications form the basis of the guilty verdict." *Id.*  But where the

record reflects "a 'genuine possibility of jury confusion' or a possibility 'that a conviction may occur as the result of different jurors concluding that the defendant committed different acts,'" a specific unanimity instruction is required. *Id.* (citation omitted).

To evaluate whether a genuine possibility of confusion exists, this Court considers the following non-exhaustive factors: 1) the indictment's text; 2) "the clarity and presentation of the government's argument"; 3) evidence complexity; and 4) "the clarity or ambiguity of the jury instructions." *Lapier*, 796 F.3d at 1097.

Here, the language in Count One of the indictment charged multiple conspiracies. 4-ER-765 (alleging conspiracy "to possess with intent to distribute and to distribute oxycodone and hydrocodone"). And Jury Instruction 20, which set forth Count One, further blurred the distinction between the multiple conspiracies, instructing in the disjunctive that the defendants conspired "to possess with intent to distribute, *or* to distribute, oxycodone *or* hydrocodone." 2-ER-211 (emphases added). Read together, the indictment and jury instructions set forth at least four separate possible conspiracies.

63

That Instruction 20 instructed jurors to "agree[] as to the particular crime which the conspirators agreed to commit," does not suffice here, as the evidence tended to show multiple conspiracies among separate conspirators.  For example, Elliott testified Motley introduced her to Math "[b]ecause [she] was addicted to the pain pills, and that way [she] would be able to get pills every month for [her] own addiction, and then he would be able to get half of them."  6-ER-1206. To feed her drug addiction, Elliott lied to Math, saying she needed medication for a knee injury.  6-ER-1230.  Elliott also shared pills with her mother, then sick with multiple sclerosis and cancer.  6-ER-1224– 25.  Elliott obtained all prescriptions written by Math from Motley.  6-ER-1208.

But this evidence of conspiracy with Elliott was distinct from the evidence of conspiracy with the other codefendants.  Before this case started, Elliott had never met Jeanette or Slater.  6-ER-1231. Whatever conspiratorial agreement Elliott may have had with Motley, its object was solely to obtain pills for her and her mother's use.  *See* 4-ER-908–09.  The record does not reflect Motley, Math, and Elliott knowingly conspired together with others for any other purpose.

Certainly, Elliott had no reason to know of any broader conspiratorial venture, and her own benefits were independent of whatever transactions occurred between Motley and Math, Jeanette, Kwoka, Sampson, or Slater. *See Lapier*, 796 F.3d at 1101.

Separately, Slater testified Urie introduced him to Motley "so [he] could buy pain pills through him, a larger amount." 5-ER-1113. Slater was dealing pills and also began selling to Motley. 5-ER-1115. Slater testified that between January 2018 through May 2019, he regularly met with Motley "[s]o [he] could buy pills." 5-ER-1116. Slater also purchased pills from another supplier to resell, partially to feed his own addiction. 5-ER-1144.

Again, this evidence of Slater's conspiracy with Motley was distinct from any evidence of conspiracy with other codefendants. In fact, when asked about his codefendants, including Elliott, Slater testified "I don't know any of them." 5-ER-1140. It is clear from Slater's testimony that whatever conspiratorial agreement Slater had with Motley, its object was solely to obtain pills to resell or for personal use. The record does not reflect Motley and Slater knowingly conspired

together with others for any shared purpose. *See Lapier*, 796 F.3d at 1101.

As for Math, he sold prescriptions to Motley in the names Motley requested. 5-ER-1035–36, 1050. But Math had no shared stake in any activity beyond the sale of the prescriptions themselves and did not know what was happening with the pills once filled. 5-ER-1039.

Even the government highlighted the separateness of the multiple conspiracies in closing. 6-ER-1317 ("[S]tarting with the conspiracy between Myron Motley and Eric Math."), 1320 ("[M]oving on to the connection and the conspiracy between Mr. Motley and Mr. Slater."), 1325 ("And the conspiracy between Mr. Motley and Ms. Elliott."). The government did not meaningfully tie in Jeanette or Sampson, and only anecdotally mentioned Kwoka. *See generally*, 6-ER-1315–33 (closing), 6-ER-1364–68 (rebuttal closing); *see also* 6-ER-1340 (defense arguing the government "didn't stitch together any conspiracy between Elliott, Kwoka, Motley, and Math").

Ultimately, conspiracy requires circumstances that "lead to an inference that some form of overall agreement exists, and that each defendant knew or had reason to know of the scope of the conspiracy

and reason to believe that their own benefits were dependent upon the success of the entire venture." *Lapier*, 796 F.3d at 1101 (cleaned up). But here, at best, the government demonstrated multiple, individual conspiracies independent of one another. *See Kotteakos v. United States*, 328 U.S. 750, 773 (1946). This it could not do. *Id.*

Though Motley did not request a specific unanimity instruction, [b]ecause the evidence in this case tended to show multiple conspiracies instead of the single charged conspiracy, the failure to give a specific unanimity instruction was plain error violating [Motley's] substantial right to a unanimous jury verdict as granted by Article III, § 2 and the Sixth Amendment." *Lapier*, 796 F.3d at 1097–98 (citation and internal quotation marks omitted). This also meets the fourth prong of plain error review, as the failure to give the instruction "jeopardizes Motley's constitutional rights." *Lapier*, 796 F.3d at 1098.

The specific unanimity instruction was required.

### 4. Multiple conspiracies

"A multiple conspiracies instruction is generally required where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude

that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir. 1989). Because Motley "was only involved, if at all, in a minor conspiracy that [was] unrelated to the overall conspiracy charged in the indictment," the "instruction [was] required" to protect against "spillover' of guilt from one defendant to another." *Id.* at 1318 (citation omitted).

Here, Motley requested the instruction, 6-ER-1272, as the evidence did not reflect he knowingly agreed to join the single, overall charged conspiracy. *Supra*, pp. 55–59, 62–67. While Motley ultimately proceeded to trial alone, the multiple conspiracies instruction was still required, as the evidence relating to his six codefendants risked transference of guilt. *Cf. United States v. Chen Chiang Liu*, 631 F.3d 993, 1000 (9th Cir. 2011) (holding there was "no potential for spillover guilt" where codefendant was acquitted by directed verdict, an explicit finding that "no evidence" supported the codefendant's guilt); *see, e.g.,* 4-ER-913–14 (Math-Kwoka transaction).

The multiple conspiracies instruction was required.

### 5. Constructive amendment

"A constructive amendment occurs 'when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them,'" *United States v. Ward*, 747 F.3d 1184, 1190 (9th Cir. 2014) (citation omitted), and "typically mandates reversal," *id.* at 1189; *see* U.S. Const. amend. V (right to grand jury).

Here, Motley objected, 6-ER-1258–61, because while the grand jury indicted for conspiracy to distribute drugs "not for a legitimate medical purpose and not in the usual course of professional practice," 4-ER-765, Instruction 20 eliminated this limitation altogether, 2-ER-211. The instruction thus impermissibly "expand[ed] the conduct for which [Motley] could be found guilty beyond its bounds," *Ward*, 747 F.3d at 1190; *Stirone v. United States*, 361 U.S. 212, 219 (1960), warranting reversal.

## III. Sentencing errors

### A. Standards of review

This Court "review[s] the district court's interpretation of the Sentencing Guidelines de novo, its application of the Guidelines to the

facts of the case for an abuse of discretion, and its factual findings for clear error." *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014).

This Court reviews "all sentencing decisions"—procedural and substantive—for "abuse of discretion." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). A district court abuses its discretion by committing legal error, failing to adequately explain its sentencing decision, or resting that decision on clearly erroneous facts. *Id*.

This Court reviews de novo whether the written judgment contains conditions of supervised release in the written judgment not imposed at sentencing. *United States v. Napier*, 463 F.3d 1040, 1042 (9th Cir. 2006).

## B. Leadership enhancement

The district court enhanced Motley's total offense level after concluding he was a "leader or organizer" under U.S.S.G. § 3B1.1(a). 1-ER-17–18. To justify this increase, it is not enough that the defendant played a "central" or "important" role; instead, the government must show by a preponderance of the evidence that the defendant exercised control over the other participants in criminal activity. *United States v.*

*Harris*, 999 F.3d 1233, 1236–37 (9th Cir. 2021); *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012); *see* U.S.S.G. § 3B1.1 cmt. n.4.

The government did not make that showing here.  At times, Motley provided drugs wholesale to Slater, who would then resell them. 4-ER-873–74, 881, 937–42; 5-ER-1113–23, 28.  At other times, Slater provided pills to Motley.  5-ER-1115, 1144.  Motley sometimes drove Jeanette—who was suffering from leukemia and had no car—to the pharmacy to fill prescriptions.  5-ER-996–99, 1005–09; 6-ER-1196.  And Motley introduced Elliott to Math so she "would be able to get pills every month for [her] own addiction," along with pills for her mother, who was sick with multiple sclerosis and chronic leucocytic leukemia. 6-ER-1206–09, 1222–25, 1231.  But Motley did not direct how Slater, Jeanette, or Elliott used their pills—whether they sold them, used them, or gave them away.  *See United States v. Harris*, 999 F.3d 1233, 1236–37 (9th Cir. 2021); *United States v. Holden*, 908 F.3d 395, 403 (9th Cir. 2018); *United States v. Avila*, 95 F.3d 887, 890–91 (9th Cir. 1996).

As for Math, the evidence showed he was at best a coequal participant, who at no time was operating under Motley's control.

*See Holden*, 908 F.3d at 402. Math testified he wrote prescriptions for Motley and his codefendants on his own accord because he considered them his friends—and because he was well paid for it. 5-ER-1038–39, 1044–48, 1055–57, 1088–89, 1096–99, 1101–03; *see United States v. Hong*, 938 F.3d 1040, 1053 (9th Cir. 2019); *Holden*, 908 F.3d at 402–03; U.S.S.G. §3B1.1 cmt. background. The government introduced no evidence Motley coerced, directed, or controlled Math's actions, leaving only Motley's facilitation and suggestions. As this Court has regularly explained, that evidence is insufficient to support the leadership enhancement. *See Harris*, 999 F.3d at 1236–37; *Holden*, 908 F.3d at 403; *Avila*, 95 F.3d at 890–91; *see also* U.S.S.G. § 3B1.1 cmt. n.4 ("enhancement inapplicable for "defendant who merely suggests committing the offense.").

## C. *Kimbrough* discretion

A district court has discretion under *Kimbrough v. United States*, 552 U.S. 85 (2007), to vary downward based on policy disagreements with the Guidelines. Where there is no indication the court understood this discretion, this Court has ordered remand. *See, e.g.*, *United States v. Henderson*, 649 F.3d 955, 958, 964 (9th Cir. 2011).

Motley objected to the denial of acceptance of responsibility and converted drug weight as lacking a sound policy basis. 1-ER-20–21; 2-ER-141–54. Indeed, oxycodone (and hydrocodone) have a converted drug weight substantially higher than other narcotics. § 2D1.1 cmt. 8(D); *see* Arshack, Daniel, *Down the Rabbit Hole: The Federal Sentencing Guidelines Oxycodone to Marijuana Equivalency Calculation Is Arbitrary and Without Reason*, The Champion (Aug. 2015).

But the district court appeared to misapprehend whether it even had the authority to *consider* Motley's policy-based argument, denying the request by stating simply, "the Court's policy, of course, [is] to be guided in every case by the sentencing guidelines." 1-ER-21. At best it is "unclear" whether the court "fail[ed] to appreciate its *Kimbrough* discretion" or "whether it recognized, but declined to exercise that discretion," warranting remand. *Henderson*, 649 F.3d at 964.

## D. Drug weight

The government bears the burden of establishing drug quantity. *United States v. Rosacker*, 314 F.3d 422, 426 n.14 (9th Cir. 2002). Drug quantity must be proven by clear and convincing evidence when that factor has an outsized impact on the offense level. *United States v.*

73

*Jordan*, 256 F.3d 922, 926 (9th Cir. 2001). That is the case here: based on drug quantity, the base offense level varies between 6 and 38, and the district court's drug weight calculation placed Motley at base offense level 30. PSR, ¶¶ 57–66; U.S.S.G. § 2D1.1(c)(5); *see Jordan*, 256 F.3d at 927–29. At sentencing the court seemed to agree, 1-ER-25, 28, but shifted the burden, faulting Motley for "not giving [it] any figures upon which to base the total quality," 1-ER-27–29.

In any event, the government failed to establish by even a preponderance of the evidence Motley was responsible for the entire amount of drugs Math prescribed. The government's own witness admitted being unsure whether Motley always received the prescriptions written to Jeanette. 4-ER-913–14. And at sentencing, the government equivocated in its characterization of the drug weight. *See* 2-ER-133 ("most of those pills" (emphasis omitted)); 2-ER-133 ("vast majority of the pills"); 2-ER-133 ("oftentimes"); 2-ER-133 ("most or all" (emphasis omitted)); 2-ER-134 ("on one occasion"); 2-ER-134 ("reasonably believed"); 2-ER-134 ("Motley did not collect from 'every single pill' from his codefendants…"); 2-ER-134 ("most, if not all"); 1-ER-22 ("almost all"). The government in fact admitted "we cannot say

74

each of these pills were for nefarious purposes." 1-ER-23. Because the government was unable to show the entire drug amount was part of the conspiracy, the district court erred in its Guidelines calculation. *See Rosacker*, 314 F.3d at 426. In addition, by ignoring Motley's argument to vary for policy reasons, 1-ER-22, the district court erred, *see Henderson*, 649 F.3d at 958, 964.

### E.   Substantively unreasonable sentence

To be reasonable, a sentence must not be greater than necessary to fulfill 18 U.S.C. § 3553(a)'s sentencing goals. *United States v. Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012). Reasonableness analysis turns on the particulars of each case, and appellate review cannot simply "rubber stamp" the sentence. *Id.* at 1087-88.

Here, the district court imposed a substantively unreasonable sentence near the high-end of the Guidelines range: 179 months. 1-ER-4. Considering the nature, circumstances, and seriousness of the offense, § 3553(a)(1), (2)(A), this sentence results in an unwarranted disparity when compared with sentences for similar crimes of significantly greater societal harm. 2-ER-157–159; *see United States v. Rand*, No. 3:16-cr-00029, Dkts. 592, 668 (D. Nev. Nov. 21, 2017) (ten-

year sentence for doctor who unlawfully distributed nearly 24,000 30mg oxycodone pills and caused the death of a patient). And of Motley's codefendants sentenced thus far, one received time served, and the other two probationary terms. Dist. Ct. Dkts. 325, 352, 373.

Moreover, Motley will be in his 70's when released, further underscoring the unreasonable sentence. 2-ER-154–57 (age at release inversely correlates with a lengthened sentence's deterrent value); 18 U.S.C. § 3553(a)(1), (2)(B)–(C). And, Motley's supportive family provides additional deterrence and public protection upon his release, rendering Motley's 15-year sentence unnecessary and substantively unreasonable. 2-ER-162–85.

## F. Deviation from oral sentence

Because every defendant "has a right under the Sixth Amendment and the Federal Rules of Criminal Procedure to be present at his sentencing," the district court imposes the sentence orally at the sentencing hearing, not through a later-issued judgment. *Napier*, 463 F.3d at 1043; Fed. R. Crim. P. 35(c). If the written judgment deviates from the court's unambiguous oral pronouncement, the court's oral sentence controls. *Napier*, 463 F.3d at 1043.

76

Here, the district court explicitly set forth four special conditions and limited imposition of any additional conditions to "those required under the law."  1-ER-51.  But the written judgment included thirteen discretionary standard conditions—*not* required under the law.  *See* 18 U.S.C. § 3583(d).  Unlike in *Napier*, the court's oral pronouncement left no room for implicit imposition of standard conditions, *see* 463 F.3d at 1043,[9] because the district court explicitly declined to impose additional conditions except as "required under the law."  1-ER-51.

This Court should strike the conditions.  *Napier*, 463 F.3d at 1043–44.

### G.    Improper delegation

The district court gave probation discretion whether to require Motley to participate in drug abuse treatment during supervision— despite acknowledging, "I really haven't seen a substance abuse

---

[9] In addition, this statement is nonbinding dicta.  463 F.3d at 1044; *United States v. Reyes*, 18 F.4th 1130, 1141 n.1 (9th Cir. 2021) (Higginson, J., concurring).  If deemed controlling, *Napier*'s language would split with the reasoned decisions of the Fourth, Fifth, and Seventh Circuits.  *Reyes*, 18 F.4th at 1140–41 (Higginson, J., concurring) (citing cases).

77

problem suffered by this defendant." 1-ER-7, 51–52. But delegating *whether* to impose a supervised release condition at all, as opposed to merely the condition's contours, is impermissible. *See United States v. Stephens*, 424 F.3d 876, 880–81 & n.2 (9th Cir. 2005). And, as the district court itself acknowledged, the condition is not tied to "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). As a result, the district court abused its discretion including this condition in the final judgment.

## Conclusion

This Court should reverse Motley's suppression denial, convictions, and sentence.

**Dated:** June 13, 2022.

Respectfully submitted,

RENE L. VALLADARES
Federal Public Defender

*/s/ Aarin E. Kevorkian*
Aarin E. Kevorkian
Assistant Federal Public Defender

*/s/ Ellesse Henderson*
Ellesse Henderson
Assistant Federal Public Defender

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** 21-10296

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

[ ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

[✓] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Mr. Myron Motley, Reg # 41289-048
FCI LOMPOC
FEDERAL CORRECTIONAL INSTITUTION
3600 GUARD ROAD
LOMPOC, CA  93436

**Description of Document(s)** *(required for all documents)***:**

Opening Brief and Addendum

**Signature** s/ Aarin E. Kevorkian     **Date** June 13, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                        *Rev. 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-10296 |

I am the attorney or self-represented party.

**This brief contains** | 13,995 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ○ ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ○ ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ○ ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ○ ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

　( ○ ) it is a joint brief submitted by separately represented parties;

　( ○ ) a party or parties are filing a single brief in response to multiple briefs; or

　( ○ ) a party or parties are filing a single brief in response to a longer joint brief.

( ○ ) complies with the length limit designated by court order dated [　　　　].

( ○ ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Aarin E. Kevorkian | **Date** | June 13, 2022 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 21-10296

The undersigned attorney or self-represented party states the following:

( • ) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/Aarin E. Kevorkian    **Date** | June 13, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**      *New 12/01/2018*